# Illinois Official Reports

## Appellate Court

---

### *City of Chicago v. Illinois Workers' Compensation Comm'n*,
### 2014 IL App (1st) 121507WC

---

| | |
|---|---|
| Appellate Court Caption | THE CITY OF CHICAGO, Appellant, v. THE ILLINOIS WORKERS' COMPENSATION COMMISSION *et al.* (Joseph Locasto, Appellee). |
| District & No. | First District, Workers' Compensation Commission Division<br>Docket No. 1-12-1507WC |
| Filed | January 6, 2014 |
| Rehearing denied | February 13, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action arising from an application for benefits based on the injuries claimant suffered while employed by a city to train for a position as a paramedic, the trial court's judgment confirming the Workers' Compensation Commission's award of temporary partial disability benefits and temporary total disability benefits for the period after August 3, 2009, the date on which claimant was found by the retirement board to have made a full recovery from his injuries, was reversed, but the portion of the trial court's judgment awarding temporary total disability benefits for time periods prior to that date was affirmed. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-L5-1071; the Hon. Margaret Brennan, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part; cause remanded. |

Counsel on
Appeal

Joseph A. Zwick, of Hennessy & Roach P.C., of Chicago, for appellant.

Jeffrey C. Hart, of Segal, McCambridge, Singer & Mahoney, Ltd., of Novi, Michigan, for appellee.

Panel

PRESIDING JUSTICE HOLDRIDGE delivered the judgment of the court, with opinion.
Justices Hoffman, Hudson, Harris, and Stewart concurred in the judgment and opinion.

**OPINION**

¶ 1    The claimant, Joseph Locasto, filed an application for adjustment of claim under the Workers' Compensation Act (the Act) (820 ILCS 305/1 *et seq.* (West 2008)) seeking benefits for injuries which he sustained while working for the employer, the City of Chicago (the City). After conducting a hearing, the arbitrator found that the claimant had proven a work-related injury and awarded him $75^5/_7$ weeks of temporary total disability (TTD) benefits plus medical expenses. However, the arbitrator denied the claimant's claim for temporary partial disability (TPD) benefits and/or maintenance benefits.

¶ 2    Both parties appealed the arbitrator's decision to the Illinois Workers' Compensation Commission (the Commission). The claimant appealed the arbitrator's denial of TPD and/or maintenance benefits. The City appealed the Commission's award of TTD benefits and medical expenses, arguing that: (1) the claimant's claims are barred by section 1(b)(1) of the Act (820 ILCS 305/1(b)(1) (West 2008)), which excludes "duly appointed member(s)" of the City's fire department from the Act's definition of a covered "employee" for purposes of the claims at issue in this case; (2) the claimant's claims are barred under the doctrines of *res judicata* and/or collateral estoppel because the Retirement Board of the Firemen's Annuity and Benefit Fund of Chicago (the Board) denied the claimant's claim for duty disability benefits arising out of the same accident and injuries at issue in this case. The Commission unanimously rejected the City's arguments, modified the arbitrator's decision by awarding TPD benefits and reducing the award of medical expenses, and affirmed and adopted the arbitrator's decision in all other respects.

¶ 3    The City sought judicial review of the Commission's decision in the circuit court of Cook County, which confirmed the Commission's ruling. This appeal followed.

- 2 -

¶ 4                                              FACTS

¶ 5      In May 2008, the claimant was employed by the City as a candidate in training at the Chicago Fire and Paramedic Academy (the Academy).[1] The claimant was training to become a paramedic with the Chicago fire department. At that time, the claimant had been licensed as a paramedic by the State of Illinois for eight years. Prior to his employment with the City, the claimant worked as a paramedic with Children's Memorial Hospital (Children's). Before he was admitted to the Academy, the claimant was examined and declared fit for duty by the City's physician and by his own doctor, and he passed a physical fitness and agility test.

¶ 6      On May 6, 2008, the claimant reported to the Academy for training at 6 a.m. The claimant testified that the candidates underwent rigorous physical training (including intense, continuous physical exercises) for several hours in an extremely hot environment with very minimal water breaks. He stated that the training included military-style hazing with yelling, verbal abuse, and the assignment of additional exercises as punishment for the entire group if a single candidate did not complete a task in a timely manner. He testified that, following a 45-minute lunch break at noon, the candidates were required to exercise vigorously straight through until 4:30 p.m. with only a single, one-minute water break. The claimant did not request special permission to get a drink of water out of fear of punishment for the entire group.

¶ 7      After completing his first day of training, the claimant experienced cramps in his right quadriceps. That evening, he drank Gatorade and water, took Advil, and iced his leg.

¶ 8      The following morning, the claimant reported to the Academy for training at 7 a.m. He testified that the candidates were required to work out straight through until lunchtime with no water breaks. According to the claimant, the instructors yelled at individual candidates, telling them to "quit or go to the hospital" if they could not take it. He testified that, following a 45-minute lunch break, the workouts became more intense and lasted for longer periods of time. During the late afternoon, the claimant noticed severe cramping in his right leg. He testified that, by the end of the training session, his leg was so sore he had difficulty climbing into his sport utility vehicle to drive home.

¶ 9      Although the claimant took Advil later that evening, he continued to experience severe cramping in his right leg. He hydrated and applied ice and heat to his leg. At 5:30 a.m., the claimant noticed his urine was tea colored and looked like blood. When he phoned his instructor to report his condition, the instructor told him to go to the emergency room.

¶ 10      The claimant sought treatment at Illinois Masonic Hospital, where he was diagnosed with rhabdomyolysis, acute kidney failure, and compartment syndrome. Rhabdomyolysis is a condition of the kidneys that occurs when muscle tissue rapidly breaks down (due to overexertion and dehydration, crush injury or toxins) and releases the protein myoglobin into the bloodstream, causing the kidneys to lose function. Compartment syndrome is a condition caused by the compression of nerves, blood vessels and muscle inside a closed space within the body. The compression can lead to tissue death due to lack of oxygenation as the blood vessels are compressed by the raised pressure within the compartment. This can cause subsequent loss

---

[1]The City requires its firemen and paramedics to undergo the same training.

- 3 -

of function, including paralysis. Amputation of the affected area might be required in some cases.

¶ 11    The medical records of the emergency room reflect that orthopedic surgeons were consulted regarding the swelling of the claimant's legs. Dr. David Hoffman, an orthopedic surgeon, diagnosed compartment syndrome and performed immediate surgery. The claimant underwent a fasciotomy wherein his right leg was cut open and left open for several weeks to relieve the pressure and swelling in the leg and to allow the muscles to expand. He remained in the intensive care unit for approximately 15 days. The claimant required over 100 staples to close the fasciotomy. Moreover, the claimant was placed on dialysis due to his rhabdomyolysis from dehydration. He was discharged from the hospital on June 13, 2008, and he continued to undergo dialysis for several months thereafter.

¶ 12    Following his discharge from the hospital, the claimant saw Dr. Steven Fox, his primary care physician, Dr. Eduardo Cremer, a nephrologist, and Dr. Hoffman. All three doctors opined that the claimant's conditions of ill-being were causally related to the intense workouts and subsequent dehydration he suffered at the Academy. The claimant also saw physicians at the Chicago fire department. The City's physicians continued the claimant off work through at least February 25, 2009.

¶ 13    On August 26, 2008, Dr. Hoffman opined that the claimant's compartment syndrome had resolved and he released the claimant to return to work from an orthopedic point of view. However, Dr. Hoffman advised that claimant continue to follow up with his nephrologist.

¶ 14    After examining the claimant and evaluating the condition of his kidneys, Dr. Cremer released the claimant to return to work at a regular job on September 17, 2008, provided that he stayed well hydrated and did not overexert himself. On November 11, 2008, Dr. Cremer released the claimant to return to "regular activities." However, during his December 3, 2009, evidence deposition, Dr. Cremer testified that the claimant should "absolutely not" return to the strenuous and intense rigors of the Academy training. Dr. Cremer opined that the claimant's kidneys will never be normal. He stated that the claimant should avoid nonsteroidal anti-inflammatory medications, antibiotics, and anything that causes extreme exhaustion or severe muscle soreness. He noted that the claimant requires annual metabolic testing. However, Dr. Cremer acknowledged that claimant could possibly run a marathon if he used extreme caution, conditioned properly, and hydrated appropriately.

¶ 15    The claimant continued to follow up with Chicago fire department physicians. The claimant testified that one of the City's nurses told him that he needed a written release from his doctor to allow him to enter the next Academy class in November 2008. Accordingly, the claimant returned to Dr. Fox and asked him for a work release. On November 5, 2008, Dr. Fox wrote a note stating that the claimant was in excellent health and that he had been cleared for "unrestricted physical activity." One week later, the claimant met with Commander Edenburgh, a doctor who heads the Chicago fire department's medical division, and gave him Dr. Fox's note. Although Commander Edenburgh read the note, he told the claimant that it was his opinion that the claimant was not ready to return to the Academy.

¶ 16    Following this meeting, the claimant continued to follow up with Dr. Fox and the Chicago fire department's doctors. The records of the Chicago fire department's medical division

reflect that, on December 9, 2008, the claimant was noted to have an elevated "Ca+ level" and was instructed to see both his renal and orthopedic physicians. On January 20, 2009, it was noted that claimant was complaining of continued right leg cramping. He was instructed to follow up with his treating orthopedic surgeon and undergo repeat lab work. On February 25, 2009 (the last recorded visit contained in the record), the claimant continued to complain of leg cramping. According to the claimant, the City asked him to undergo a functional capacity examination (FCE) but refused to pay for the test after the claimant's insurance denied coverage. The City's doctors never released the claimant to return to the Academy.

¶ 17    In his report dated February 9, 2009, Dr. Fox opined that: (1) it is highly likely that the claimant has some permanent kidney damage; (2) the claimant will be forever prone to recurrent bouts of acute renal failure; and (3) the claimant has been irreversibly compromised by the events occurring due to the Academy training. Dr. Fox stated that the claimant should not subject himself to the same rigors that he was put through at the Academy. On July 23, 2009, Dr. Fox wrote a letter clarifying his November 5, 2008, physical activity release. In the letter, Dr. Fox stressed that, although his November 5, 2008, release had allowed for unrestricted physical activity, "at no time did [he] intend for this to mean that [the claimant] could or should return to the Fire Academy." The doctor noted that the claimant was "well aware of the harm caused by the undue severity of [the Academy's] training," and that "[h]e knew my [November 5, 2008] note cleared him to seek other employment and to engage in physical activity on his own in a way that did not subject him to the extremes of exercise, as expected at the Academy." The doctor also prescribed additional physical therapy for the claimant's ongoing complaints of right thigh pain and cramping.

¶ 18    On May 7, 2009, Dr. Isaac Marcos, an occupational health physician with the Chicago fire department, issued a letter in which he opined that the claimant had completely recovered and had been returned to full duty without restrictions by Drs. Fox, Cremer, and Hoffman. He further opined that the claimant was currently in stable condition and he noted that the claimant remained off duty and had exhausted all his injury and sick leave.

¶ 19    On August 17, 2009, the claimant was examined by Dr. Kathleen Weber, the City's independent medical examiner (IME). Dr. Weber is an internist who specializes in sports medicine. Dr. Weber opined that the claimant's acute compartment syndrome, exercise-induced rhabdomyolysis, and subsequent acute renal failure were causally related to his May 2008 training at the Academy. She also opined that claimant had no residual right leg disability as a result of his compartment syndrome other than some muscle tightness which she thought would be relieved with a short two- to three-week course of physical therapy and home strengthening/stretching exercises. Dr. Weber concluded that, following this treatment, the claimant would be at maximum medical improvement (MMI). The doctor opined that the claimant could return to work for the Chicago fire department, and she assumed that he would return to the Academy. However, she acknowledged that the claimant is now at a higher risk for rhabdomyolysis and noted that, if the claimant returned to the same rigorous training conditions at the Academy, he would have to be in great condition and would need to be monitored throughout the training.

¶ 20    On December 8, 2009, the claimant was examined by Dr. Sheldon Hirsch, a nephrologist who served as the City's second IME. Dr. Hirsch opined that the claimant seemed to have no residual deficits and had been cleared to perform any work from a renal viewpoint. However, Dr. Hirsch noted that:

> "given the injury that the claimant suffered, I advised him against any form of particularly strenuous exercise, which conceivably could lead to a recurrent injury. Presumably this would preclude him from returning to the fire department, assuming that strenuous training sessions would be necessary."

Moreover, Dr. Hirsch noted that he would defer to an internist or neurologist regarding whether there was "any lingering injury or restrictions derived from his muscle injury." Dr. Hirsch noted that the claimant was not to return to work that included extensive exercise.

¶ 21    Although the City paid the claimant salary continuation from May 8, 2008, through May 8, 2009, it did not pay him TTD benefits. The City did not allow the claimant to return to the Academy and did not offer him any alternative employment.

¶ 22    In October, 2009, after he was terminated by the City, the claimant sought employment with his previous employer (Children's) as an emergency room paramedic. However, there were no such positions available. Beginning on October 6, 2009, the claimant obtained part-time employment with Children's working on an "IV Access Team." The claimant and his team start IVs for patients throughout the hospital when the nurses are unable to do so. The claimant testified that he works two 12-hour shifts per week and earns a net weekly salary of $900 to $1,000 per week. He eventually obtained group insurance coverage again through Children's and subsequently resumed his treatment with Dr. Fox.

¶ 23    The claimant testified that, at the time of the arbitration hearing, he continued to have cramping and pain in his right leg which is increased by prolonged sitting. He stated that he had gained approximately 20 pounds since his accident due to his reduced activity level. Pursuant to his physicians' instructions (and due to his fear of re-injury), he no longer plays sports or exercises vigorously.

¶ 24    Relying on the claimant's testimony and the testimony of Drs. Cremer, Hoffman, Fox, Hirsch, and Weber, the arbitrator found that the claimant sustained an accident arising out of and in the course of his employment on May 6, 2008, and May 7, 2008, and that the claimant's present condition of ill-being is causally related to those work accidents. The arbitrator found that the claimant was eligible for benefits under the Act because he was not a "duly appointed member" of the Chicago fire department at the time of his work accidents. In support of that conclusion, the arbitrator cited *Dodaro v. Illinois Workers' Compensation Comm'n*, 403 Ill. App. 3d 538, 539 (2010), in which we held that a Chicago police recruit in training was not a "duly appointed member" of the Chicago police department because a recruit does not have full police powers until he or she completes training at the police academy and is sworn in as a police officer. The arbitrator "applie[d] the same logic" to the claimant, who was a paramedic candidate.

¶ 25    The arbitrator found that the claimant had incurred $152,788.84 in reasonable and related medical expenses for treatment provided to him to cure or relieve his condition. The arbitrator

ordered the City to pay these expenses pursuant to the fee schedule. Moreover, the arbitrator concluded that the claimant was entitled to TTD and/or maintenance benefits from May 8, 2008 through October 5, 2009 (the day before the claimant began part-time employment as an IV technician with Children's).

¶ 26 However, the arbitrator found that the claimant did not prove that he was entitled to receive TPD or maintenance benefits after his return to work on October 6, 2009, and denied the claimant's claim for such benefits. In support of this decision, the arbitrator noted that: (1) although several physicians restricted the claimant from returning to the vigorous strenuous activity of Academy training, no physician restricted him from returning to work as a paramedic; (2) no physician restricted the claimant to part-time work; (3) the claimant did not testify to a job search other than attempting to return to his old position at Children's and his new position at Children's as an IV technician; (4) a full-time, 40-hour work week at the claimant's current hourly salary approximates his salary as a paramedic candidate with the City.

¶ 27 Both parties appealed the arbitrator's decision to the Commission. The claimant appealed the arbitrator's denial of TPD and/or maintenance benefits. The employer appealed the Commission's award of TTD benefits and medical expenses, arguing that the claimant's claims are barred by section 1(b)(1) of the Act (820 ILCS 305/1(b)(1) (West 2008)), which excludes "duly appointed member(s)" of the employer's fire department from the Act's definition of a covered "employee" for purposes of the claims at issue in this case; (2) the claimant's claims are barred under the doctrines of *res judicata* and/or collateral estoppel because the Board denied the claimant's claim for duty disability benefits arising out of the same accident and injuries at issue in this case.

¶ 28 The Commission modified the arbitrator's decision by awarding TPD benefits. The Commission found that the claimant was entitled to TPD benefits at a rate of $251.40 for the period from October 6, 2009, through May 5, 2010. The Commission concluded that the arbitrator had "erred in calculating [the] [c]laimant's current wages based on a 40 hour a week schedule because [the] [c]laimant is currently employed as a part time employee for Children's *** and not full time." Moreover, although the Commission acknowledged that no doctor has restricted the claimant from part time employment, it noted that "it is also true that [the City] refused to permit [the] [c]laimant to return." The Commission also observed that the City required the claimant to undergo a FCE but denied coverage for the FCE. Further, although the Commission acknowledged the limited nature of the claimant's job search, the Commission "[found] it significant that [the City] failed to offer any vocational assistance after refusing to let [the] [c]laimant return to the *** Academy." The Commission also found that the City failed to comply with section 7110.10 of title 50 of the Illinois Administrative Code (50 Ill. Adm. Code 7110.10 (2006)) which required the City to perform a vocational assessment even though the claimant did not request vocational assistance.

¶ 29 The Commission rejected the City's arguments. Specifically, the Commission concluded that the claimant was not a "duly appointed member" of the Chicago fire department and, thus, is not precluded from benefits under section 1(b)(1) of the Act. The Commission held that this issue was controlled by our decision in *Dodaro*, 403 Ill. App. 3d 538.

¶ 30    Further, the Commission rejected the City's argument that the Board's denial of the claimant's application for duty disability benefit's bars the claimant's claims before the Commission under principles of *res judicata* and/or collateral estoppel. In so holding, the Commission reasoned:

> "The issues presented before the Commission here are not the same issues that were presented before the *** Board. The issue before the *** [B]oard was whether [the] [c]laimant was entitled to receive duty disability benefits. The *** [Board] found that he was not disabled and therefore not entitled to benefits from the Firemen's Annuity and Benefit Fund of Chicago because he was capable of returning to work. The issues before the Commission are jurisdiction, accident, causal connection, medical expenses, temporary disability benefits, temporary partial disability benefits, and penalties and attorneys' fees. The *** [B]oard made no determinations that are relevant to the issues on review here. The Commission concludes that [the] [c]laimant's claim is not barred by collateral estoppel or *res judicata*."

¶ 31    The Commission further modified the arbitrator's decision by reducing the award of medical expenses, and affirmed and adopted the arbitrator's decision in all other respects.

¶ 32    The City sought judicial review of the Commission's decision in the circuit court of Cook County, which confirmed the Commission's ruling. This appeal followed.

¶ 33                                    ANALYSIS

¶ 34                            1. Section 1(b)(1) of the Act

¶ 35    The City argues that the claimant's claim is barred by section 1(b)(1) of the Act (820 ILCS 305/1(b)(1) (West 2008)). At the time of the claimant's May 2008 work injury, that section provided that "[a] duly appointed member of a fire department in any city, the population of which exceeds 200,000 according to the last federal or State census,[2] is an employee under this Act only with respect to claims brought under paragraph (c) of Section 8." 820 ILCS 305/1(b)(1) (West 2008). The claimant's claims were not brought pursuant to section 8(c) of the Act. The City argues that the claimant was a "duly appointed member" of the Chicago fire department at the time of his May 2008 work injury and, therefore, his claims are barred under section 1(b)(1). The Commission rejected this argument. We interpret the meaning of the statutory exclusion in section 1(b)(1) *de novo*. *Dodaro*, 403 Ill. App. 3d at 544-45. However, because the Commission's determination that the claimant was not a "duly appointed member" of the Chicago fire department concerns the legal effect of a given set of facts, we review that decision for clear error. *Id.* We will reverse the Commission's decision "only when there is evidence supporting reversal and [we are] left with the definite and firm conviction that a mistake has been committed." *Id.* at 544.

_____

[2]Effective August 8, 2011, the legislature amended the statute by substituting the term "500,000" for "200,000." This amendment is immaterial. The parties do not dispute that the City of Chicago has more than 500,000 residents.

¶ 36        During the arbitration hearing, each party presented evidence regarding the claimant's employment status at the time he was injured. At that time, the claimant was a candidate fire paramedic in training at the Academy. The claimant testified that, as a candidate, he was not a sworn officer of the fire department, he was not given a badge or identification identifying him as a Chicago fire paramedic,[3] and he received a lower salary than a sworn paramedic. According to the claimant, candidates are not able to render medical assistance to citizens on behalf of the City. Candidates engage in physical training and take classes in a classroom environment, but they do not work as actual paramedics. The claimant testified that candidates are not considered paramedics until they graduate from the Academy and are sworn in at Navy Pier.

¶ 37        Kenneth Kaczmarz, the executive director of the Firemen's Annuity and Benefit Fund of Chicago, testified on behalf of the City. Kaczmarz testified that, according to the fire department's records, the claimant was hired as a "fireman/paramedic" beginning May 1, 2008. Kaczmarz stated that, once an employee is put on the Chicago fire department's payroll and begins his duties, he is a "full and contributing member[ ] of the pension fund," even if he is a candidate in training at the time. Kaczmarz considered the claimant an "active fireman" under section 6-109 of the Illinois Pension Code (40 ILCS 5/6-109 (West 2008)) who was entitled to apply for and receive disability benefits under the Code. The City also presented various fire department personnel records signed by the claimant shortly before he began his employment which identify him as a "paramedic" working for the fire department. The City argues that these documents, together with Kaczmarz's testimony, establish that the claimant was a "duly appointed member" of the Chicago fire department at the time of his May 2008 work injury and, therefore, his claims are barred under section 1(b)(1) of the Act.

¶ 38        We disagree. We addressed a similar issue in *Dodaro*. In that case, the City argued that a Chicago police recruit who was injured during a training exercise was a "duly appointed member" of the Chicago police department and therefore not eligible for benefits under section 1(b)(1) of the Act. Construing that section of the Act *de novo*, we interpreted the word "member" to mean "a person who has been admitted [usually formally] to the responsibilities and privileges of some association or joint enterprise." (Internal quotation marks omitted.) *Dodaro*, 403 Ill. App. 3d at 546. Thus, we found that "the legislature intended the statutory exclusion to apply to individuals who have been formally admitted to the responsibilities and privileges of the Chicago police department." *Id.* The claimant testified that police recruits were instructed that they were not police officers and had no authority to act as police officers. *Id.* at 540. They were not issued badges or any identification issued by the Chicago police department and they were not authorized to make arrests. *Id.* Recruits, unlike actual officers, were not "sworn in." *Id.* We held that the evidence showed that the claimant did not have full police powers and had not been "formally admitted to the responsibilities and privileges" of the Chicago police department at the time of her injury. *Id.* at 546. Accordingly, we held that the Commission's ruling that police recruits were not "duly appointed members" of the police

_____

[3]The claimant stated that his uniform consisted of basic blue pants and a blue shirt without a Chicago fire department emblem.

department for purposes of section 1(b)(1) was not clearly erroneous. *Id.* We reached this holding even though "[t]here was evidence that recruits were treated like sworn police officers with respect to their eligibility for benefits under the Police Pension Fund." *Id.*

¶ 39      The same reasoning applies here. As *Dodaro* makes clear, the dispositive question is whether the claimant had been "formally admitted to the responsibilities and privileges" of the Chicago fire department at the time of his injury. *Id.* As noted, at the time he was injured, the claimant was a candidate fire paramedic in training at the Academy, not a sworn member of the fire department. He did not work as a paramedic, was not given a badge or identification identifying him as a Chicago fire paramedic, and was not authorized to render medical assistance to citizens on behalf of the City. Like the claimant in *Dodaro*, he did not have the full powers and privileges of the job for which he was training. Thus, the Commission's ruling that the claimant was not a "duly appointed member" of the Chicago fire department was not clearly erroneous.

¶ 40      The City argues that the claimant was a "duly appointed member" of the fire department at the time of his injury because: (1) he was an "active fireman" under section 6-109 of the Pension Code (40 ILCS 5/6-109 (West 2008)) and was therefore entitled to apply for and receive disability benefits under the Code; and (2) fire department personnel records signed by the claimant identify him as a "paramedic." We rejected the same types of arguments in *Dodaro*. There, the City presented witnesses (including the executive director of the police pension fund) who testified that police recruits injured during training were eligible to receive duty disability benefits under the Pension Code. *Dodaro*, 403 Ill. App. 3d at 541-42. Moreover, the City presented documents that the claimant signed during her training at the police academy which referred to her as a "member" of the police department. *Id.* at 547. However, "looking beyond the label placed on recruits in [those] documents" (and beyond the claimant's employment classification under the Pension Code), we focused instead on the fact that the claimant lacked the full powers and privileges of a Chicago police officer.

¶ 41      We employ the same analysis here. The fact that the claimant was considered an "active fireman" under the Pension Code for purposes of duty disability benefits does not establish that he is a "duly appointed member" of the fire department under section 1(b)(1) of the Act. As we made clear in *Dodaro*, the claimant's status under section 1(b)(1) depends upon the powers and privileges he enjoyed at the time of his injury, not upon his eligibility for benefits under the Pension Code or any labels used in personnel documents.

¶ 42                              2. *Res Judicata* and Collateral Estoppel

¶ 43      The City argues that the Board's denial of claimant's claim for duty disability benefits under the Pension Code bars the claimant's workers' compensation claims under principles of *res judicata* and/or collateral estoppel. We begin our analysis of this issue by providing a brief factual background of the proceedings before the Board. On April 9, 2009, the claimant filed an application for duty-related disability benefits with the Board pursuant to section 6-151 of the Pension Code (40 ILCS 5/6-151 (West 2008)). After conducting a hearing during which the claimant testified and presented testimony from some of his treating doctors, the Board issued a letter on August 3, 2009, denying the claimant's application.

¶ 44    The Board's written decision contained several express findings of fact, including that: (1) prior to May 8, 2008, the claimant was an "active fireman" as that term is defined under section 6-109 of the Pension Code (40 ILCS 5/6-109 (West 2008)); (2) on May 8, 2008, the claimant was engaged in training activities at the Academy when he experienced pain in his legs and dark-colored urine; (3) the claimant was subsequently diagnosed with "acute rhahdmyelesis [*sic*]" and with compartment syndrome of the right lower extremity; (4) the claimant received medical treatment and physical therapy to treat his kidney condition "until his conditions subsided"; (5) on May 7, 2009, a physician with the Chicago fire department found the claimant to be in stable condition; (6) the claimant was examined by the physician consultant to the Board, Dr. George S. Motto, who found the claimant to be in "good physical condition"; and (7) "[the claimant's] treating nephrologist, Sudesh K. Vohra, M.D. and the *** Board's physician-consultant, George S. Motto, M.D., have concluded that the [claimant] is able to perform his duties in the Chicago Fire Department and that his kidney condition has stabilized."

¶ 45    Based on these findings, the Board concluded that the claimant "has made a full recovery from the conditions that he experienced while in training with the Chicago Fire Department," he "is not currently experiencing any physical condition that would prevent him from performing his paramedic duties with the Chicago Fire Department," and the claimant "has not produced sufficient evidence to meet his burden of proving that he is entitled to receive a Duty Disability Benefit pursuant to 40 ILCS 5/6-151 of the Illinois Pension Code."

¶ 46    The claimant filed a complaint for administrative review of the Board's decision in the circuit court of Cook County, arguing that the Board's decision contained factual errors, was against the manifest weight of the evidence, and was contrary to law. The circuit court affirmed the Board's decision.[4]

¶ 47    In the case at bar, the City argues that the Board's denial of the claimant's claim for duty disability bars his workers' compensation claims under the doctrine of *res judicata* and/or collateral estoppel. We hold that *res judicata* does not apply here. However, we hold that some (but not all) of the claimant's claims are barred under principles of collateral estoppel.

¶ 48    Under the doctrine of *res judicata*, "a final judgment rendered by a court of competent jurisdiction on the merits is conclusive as to the rights of the parties and their privies, and, as to them, constitutes an absolute bar to a subsequent action involving the same claim, demand, or cause of action." *J&R Carrozza Plumbing Co. v. Industrial Comm'n*, 307 Ill. App. 3d 220, 223 (1999). Administrative agency decisions have *res judicata* effect when the agency's determination is made in proceedings which are adjudicatory, judicial, or quasi-judicial in nature. *McCulla v. Industrial Comm'n*, 232 Ill. App. 3d 517, 520 (1992). "To establish *res judicata*, a party must show: (1) that the former adjudication resulted in a final judgment on the merits; (2) that the former and current adjudications were between the same parties; (3) that the former adjudication involved the same cause of action and same subject matter of the later case; and (4) that a court or administrative agency of competent jurisdiction rendered the first judgment." *Hannigan v. Hoffmeister*, 240 Ill. App. 3d 1065, 1075-76 (1992).

---

[4]Apparently, the claimant chose not to appeal the circuit court's decision.

¶ 49 Several of these elements cannot be satisfied in this case. First, the litigation before the Board involved different parties than the case before the Commission. The defendant in the claimant's action for duty disability benefits was the Board, while the defendant in the instant case is the City. The Board and the City are separate entities. See, *e.g.*, *Hannigan*, 240 Ill. App. 3d at 1076 (concluding that two state agencies were not identical parties for *res judicata* purposes); *Rhoads v. Board of Trustees of the City of Calumet City Policemen's Pension Fund*, 293 Ill. App. 3d 1070, 1075 (1997) (holding that the City of Calumet City and the Calumet City Police Pension Board were different parties, precluding the application of collateral estoppel).

¶ 50 Moreover, the claimant's claim for duty disability benefits does not involve the "same cause of action and same subject matter" as his claims for workers' compensation benefits. The latter claims were brought under a different statute (the Act, as opposed to the Pension Code), and they seek benefits that are not available under the Pension Code, such as TTD benefits and medical expenses. See *Hannigan*, 240 Ill. App. 3d at 1076 (holding that claim under the Pension Code was not same cause of action as prior claim bought under the Act, precluding the application of *res judicata*).[5]

¶ 51 However, some, but not all, of the claimant's claims before the Commission are barred by principles of collateral estoppel. "Collateral estoppel prohibits the relitigation of an issue essential to and actually decided in an earlier proceeding by the same parties or their privies." *McCulla*, 232 Ill. App. 3d at 520. Administrative agency decisions made in adjudicatory, judicial, or quasi-judicial proceedings may have collateral estoppel effect. *Id.* Collateral estoppel may be asserted when: (1) the issue decided in the prior adjudication is identical to the issue in the current action; (2) the issue was "necessarily determined" in the prior adjudication; (3) the party against whom estoppel is asserted was a party or in privity with a party in the prior action; (4) the party had a full and fair opportunity to contest the issue in the prior adjudication; and (5) the prior adjudication must have resulted in a final judgment on the merits. *Mabie v. Village of Schaumburg*, 364 Ill. App. 3d 756, 758 (2006); *McCulla*, 232 Ill. App. 3d at 520.

¶ 52 The City argues that the Board's denial of duty disability benefits precludes all of the claimant's workers' compensation claims. In support of this argument, the Board relies on cases which hold that the standard for determining whether a fireman's injury was incurred in the line of duty under the Pension Code is equivalent to the standard for determining whether an accidental injury arose out of and in the course of his employment under the Act. See, *e.g.*, *McCulla*, 232 Ill. App. 3d at 521; *Mabie*, 364 Ill. App. 3d at 760-61; *O'Callaghan v. Retirement Board of Firemen's Annuity & Benefit Fund*, 302 Ill. App. 3d 579, 583 (1998);

---

[5]Accordingly, while the Board had jurisdiction to decide the claimant's claims for duty disability benefits, it would not be a tribunal of competent jurisdiction to decide his claims for workers' compensation benefits. The award of workers' compensation benefits is controlled by the Act, and the Commission has exclusive original jurisdiction to decide claims for such benefits. See 820 ILCS 305/18 (West 2008) (providing that "[a]ll questions arising under th[e] Act, if not settled by agreement of the parties interested therein, shall, except as otherwise provided, be determined by the Commission"); see also *Hartlein v. Illinois Power Co.*, 151 Ill. 2d 142, 157-58 (1992); *Nestle USA, Inc. v. Dunlap*, 365 Ill. App. 3d 727, 732 (2006).

*Wilfert v. Retirement Board of the Firemen's Annuity & Benefit Fund*, 263 Ill. App. 3d 539, 544 (1994). Applying this principle, we have held that a determination by the Board that a fireman's injury was not incurred in the line of duty collaterally estops that fireman from relitigating the issue of causation before the Commission. *McCulla*, 232 Ill. App. 3d at 521-22.[6] However, these cases are inapposite. Here, the Board did not find that the injuries the claimant suffered during his training in May 2008 were not incurred in the line of duty. (In fact, to the extent the Board addressed causation at all, it implicitly found that the claimant's injuries were caused by his training.) The Board merely held that, however the claimant's injuries were caused, they were resolved by August 3, 2009 (the date of the Board's decision) and that the claimant was fully recovered and able to perform his duties as a paramedic with the City at that time. Accordingly, the Board's decision is fully consistent with the Commission's award of TTD benefits and medical expenses prior to August 3, 2009. The City's argument that the Board's decision collaterally estops *all* of the claimant's workers' compensation claims cannot succeed.

¶ 53    However, the Board's decision does collaterally estop the claimant from relitigating the issues of whether he was disabled after August 3, 2009, and whether his work-related injuries rendered him unable to work as a paramedic after that date. As noted, the Board decided that he was fully recovered and fully able to perform his job as a paramedic by that date. In order to award TTD and TPD benefits after that date, the Commission would have to reach a contrary conclusion. See, *e.g.*, *Mechanical Devices v. Industrial Comm'n*, 344 Ill. App. 3d 752, 759 (2003) ("To establish entitlement to TTD benefits, a claimant must demonstrate not only that he or she did not work, but also that the claimant was unable to work."); 820 ILCS 305/8(a) (West 2008) (providing that an employee is entitled to TPD benefits only when he is "*working light duty* on a part-time basis or full-time basis and earns less than he or she would be earning if employed in the full capacity of the job or jobs" (emphasis added)). All of the requirements for collateral estoppel are met as to any claim for TTD or TPD benefits after August 3, 2009. We therefore reverse the Commission's award of such benefits.[7] However, we emphasize that,

---

[6]*Mabie* stands for the converse proposition. In *Mabie*, our appellate court held that the Commission's decision that a fireman's injury arose out of and in the course of his employment barred the Village of Schaumburg from relitigating the issue of causation in a subsequent proceeding under the Public Employee Disability Act (5 ILCS 345/0.01 *et seq.* (West 2000)) by arguing that the claimant's injury did not occur in the line of duty.

[7]The claimant argues that there were "procedural irregularities" in the Board proceedings and that the Board's decision was based on blatantly incorrect factual findings. By raising these issues, the claimant appears to suggest that he did not have a "full and fair" opportunity to litigate his claims before the Board. However, the Board conducted a hearing during which the claimant had the opportunity to testify and to present evidence, including medical witness testimony. Moreover, the circuit court affirmed the Board's decision, and the claimant apparently chose not to appeal that decision. Thus, we are not in a position to pass on any alleged errors or "procedural irregularities" in the Board's decision, and we cannot deny the preclusive effect of the Board's judgment. See *McCulla*, 232 Ill. App. 3d at 521 (rejecting claimant's argument that board's decision should not collaterally estop his workers' compensation claim because the board misunderstood his claims and the applicable law, and stating

although TTD and TPD benefits after August 3, 2009, are barred by collateral estoppel, all benefits awarded for any time periods before that date are not barred.

¶ 54    Because the Commission's award of TPD benefits commenced on October 6, 2009, it is barred by collateral estoppel. Accordingly, we do not need to address the City's alternative argument that the Commission's award of TPD benefits was against the manifest weight of the evidence.

¶ 55                                    CONCLUSION

¶ 56    For the foregoing reasons, we reverse the judgment of the circuit court of Cook County to the extent that it confirmed the Commission's award of TPD and TTD benefits for any time period after August 3, 2009. We affirm the circuit court of Cook County's judgment in all other respects, including its confirmation of the Commission's award of TTD benefits for time periods prior to August 3, 2009.

¶ 57    Affirmed in part and reversed in part; cause remanded.

---

that "whatever the pension board's understanding of the claimant's claim and any errors of law are not before this court" and that "[t]he claimant did not appeal the board's determination").