2020 IL App (3d) 190159

Opinion filed July 16, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| LANDMARKS ILLINOIS, NATIONAL TRUST FOR HISTORIC PRESERVATION, ROCK ISLAND PRESERVATION SOCIETY, MOLINE PRESERVATION SOCIETY, BROADWAY HISTORIC DISTRICT ASSOCIATION, FREDERICK SHAW, and DIANE OESTREICH, | ) ) ) ) ) ) ) ) | Appeal from the Circuit Court of the 14th Judicial Circuit, Rock Island County, Illinois, |
| Plaintiffs-Appellants, | ) ) ) | Appeal No. 3-19-0159 Circuit No. 2019-CH-40  Honorable Jodi M. Hoos, |
| v. | ) ) | Judge, Presiding. |
| THE ROCK ISLAND COUNTY BOARD, and THE ROCK ISLAND COUNTY PUBLIC BUILDING COMMISSION, | ) ) ) ) ) | |
| Defendants-Appellees. | ) | |

_____

JUSTICE HOLDRIDGE delivered the judgment of the court, with opinion.
Justices Carter and Schmidt concurred in the judgment and opinion.

_____

**OPINION**

¶ 1       This action was brought to halt the demolition of the Rock Island County courthouse

(courthouse), which the plaintiffs claim the defendants are attempting to accomplish in violation

of the law. The courthouse was constructed in 1896 and opened in 1897. After constructing new

courtrooms and other judicial facilities as an annex to the nearby Rock Island County jail

(Annex), defendants Rock Island County Board (the Board) and Rock Island County Public Building Commission (PBC) entered into an intergovernmental agreement to demolish the courthouse. In order to complete the demolition project, the defendants must obtain a permit from the Illinois Environmental Protection Agency (IEPA) to discharge stormwater associated with the demolition site.

¶ 2    The Illinois Department of Natural Resources (IDNR), which has filed an *amicus* brief in support of the plaintiffs' position in this appeal, has determined that the courthouse is eligible for listing on the National Register of Historic Places and is therefore a "historic resource" triggering the protections of the Illinois State Agency Historic Resources Preservation Act (Preservation Act) (20 ILCS 3420/1 *et seq.* (West 2016)). Pursuant to the Preservation Act's requirements, the IDNR initiated a consultation process with the IEPA to discuss alternatives to the proposed demolition that could eliminate, minimize, or mitigate the adverse impact that the demolition would have upon a historic resource. The IDNR directed the defendants to halt the planned demolition until that consultation process has been completed. The defendants defied the IDNR's directive and announced their intention to proceed with the demolition immediately.

¶ 3    Plaintiffs Landmarks Illinois, the National Trust for Historic Preservation, the Rock Island Preservation Society, the Moline Preservation Society, the Broadway Historic District Association, Frederick Shaw (Shaw), and Diane Oestreich (Oestreich) are local and national organizations and individuals "who appreciate (or whose members appreciate) the cultural, aesthetic, and historic value of the Historic Courthouse." Plaintiffs Illinois Landmarks and Shaw are also owners of bonds issued by the PBC for the construction of the Annex, the proceeds of which the defendants intend to use to finance the demolition. The plaintiffs filed a complaint in the circuit court of Rock Island County seeking declaratory relief, a temporary restraining order

(TRO), and an injunction halting the demolition. They alleged that the defendants' plan to demolish the courthouse violated two Illinois statutes—the Preservation Act and the Public Building Commission Act (Commission Act) (50 ILCS 20/1 *et seq.* (West 2016))—and the PBC's covenants with plaintiff bondholders Illinois Landmarks and Shaw.

¶ 4 The defendants moved to dismiss the plaintiffs' complaint under section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2018)), arguing that the allegations in the plaintiffs' complaint failed as a matter of law because the planned demolition of the courthouse was immune from the Preservation Act, did not violate the Commission Act, and did not breach the PBC's bond covenants with Illinois Landmarks and Shaw. The Board also moved to dismiss the complaint under section 2-619 of the Code (735 ILCS 5/2-619 (West 2018)), arguing that the plaintiffs lacked standing to bring their claims against the defendants.

¶ 5 On March 19, 2019, the trial court issued an oral ruling denying the defendants' section 2-619 motion to dismiss for lack of standing but granting the defendants' section 2-615 motions to dismiss all of the plaintiffs' claims for failure to state a claim. The circuit court granted plaintiffs Illinois Landmarks and Shaw leave to replead their bond claims but barred any future claims seeking equitable relief under the Preservation Act or the Commission Act. The plaintiffs asked the trial court to keep the TRO in place for seven days while they decided whether to file an appeal. The trial court denied the plaintiffs' request. Two days later, the plaintiffs filed an interlocutory appeal of the trial court's order pursuant to Illinois Supreme Court Rule 307(d) (eff. Nov. 1, 2017)) and an emergency petition to stay the trial court's order pending resolution of the appeal.

¶ 6 On March 22, 2019, we granted the plaintiffs' emergency petition for stay. That same day, the trial court issued a written order memorializing its dismissal of counts I, II, and III of the

3

plaintiffs' complaint with prejudice. The trial court's written order included a finding, pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016)), that "an appeal may be taken from its final judgment on counts I, II, and III because there [was] no just reason for delaying an appeal." Thereafter, the plaintiffs filed a Notice of Appeal appealing the court's written judgment order and asked this Court to consolidate that appeal with their prior Rule 307(d) interlocutory appeal.

¶ 7        On April 1, 2019, we granted plaintiffs' Rule 307(d) petition and ordered that both the stay that we had previously entered and the TRO issued by the trial court would remain in full force and effect until we have issued a decision on the appeal at issue in this case.

¶ 8                                                FACTS

¶ 9        The following facts are taken from the allegations of the plaintiffs' complaint and documents attached to the complaint. The PBC was established by the Board on October 1, 1981, for the "sole purpose *** of exercising the powers and authority of [the Commission Act] to provide a good and sufficient jail for the use of Rock Island County." In or around 1998, the PBC added courtrooms to the Rock Island County jail building in a facility that was referred to as the jail's "Justice Center."

¶ 10       In 2013, the Board sought to build a new courthouse and administration center as an annex to the jail and Justice Center. Acknowledging that building a courthouse and county administration center was outside the scope of the PBC's existing authorization, the Board planned a referendum asking local citizens to expand the PBC's authority so that it could legally build the proposed Annex. An informational voter guide on the proposed referendum stated that the county could not use the existing PBC to build the proposed Annex because (1) "[w]hen this PBC was established in the 1980s, it was limited to just jail purposes.—That has severely limited [the county's] ability to repair/replace the aging courthouse"; (2) "[a] Courthouse and County

4

Administration Center are outside the scope of the present PBC authorization"; and (3) "[i]t takes voter approval to expand the scope of the PBC." On April 9, 2013, the Board placed the question of whether to expand the powers of the PBC beyond the provision of a jail to the electorate at a referendum. The ballot provision read:

> "Shall the County Board of Rock Island County be authorized to expand the purpose of the Rock Island County Building Commission, Rock Island County, Illinois, to include all the powers and authority prescribed by the Public Building Commission Act?"

The referendum failed to pass, with 61% of voters voting against the proposal.

¶ 11      Following the failure of the referendum, the Board passed a resolution on June 17, 2015, authorizing the PBC to build a new courthouse as an annex to the jail, which would include additional civil courtrooms, circuit clerk space, and a law library. The chief judge of the Fourteenth Judicial Circuit (Judge Walter Braud) subsequently appointed a special prosecutor to file a *quo warranto* lawsuit against the PBC within the Fourteenth Judicial Circuit (the 2015 Litigation) in order to test whether the PBC had the authority to build the Annex pursuant to its original purpose of building a jail.

¶ 12      In the 2015 Litigation, the circuit court of Henry County held that the Annex project was "within and consistent with" the PBC's purpose of providing for a good and sufficient jail and was therefore within the scope of the PBC's existing authority. In support of its ruling, the court found, *inter alia*, that (1) the PBC's June 17, 2015, resolution for the construction of the Annex "is consistent with the previous actions taken by [the PBC] for the construction of the original Justice Center, which included the jail facilities and secure detention areas for transport and temporary confinement, and court security for proceedings in both civil and criminal matters";

(2) the June 17, 2015, resolution "does not expand upon that purpose, but on the contrary, enhances it and is therefore a proper exercise of the authority under which the [PBC] was formed in 1981"; and (3) the June 17, 2015, resolution "does not contemplate a totally separate structure, but rather, one that is totally integrated and connected to the existing structure." No appeal was taken from the circuit court's judgment.

¶ 13    Although the circuit court's order terminating the 2015 Litigation interpreted the PBC's purpose, it did not address the defendants' compliance with section 14(a)(2) of the Commission Act. That section provides that, where a public building commission selects and designates an "area" as the "site *** to be [used] for the erection, alteration or improvement of a building or buildings," and the original resolution for the creation of the commission has been adopted by the governing body of the county, "the site or sites selected *** are subject to approval" either by three-fourths of the of the members of the governing body of the county seat or through an election referendum. 50 ILCS 20/14(a)(2) (West 2016).[1] Nor did the 2015 Litigation address whether the PBC had the authority to demolish the prior courthouse. That is not surprising because, at the time of the 2015 Litigation, no one had proposed that the PBC could or should demolish the old courthouse; the only issue presented in the 2015 Litigation was whether building the Annex was within the scope of the original resolution creating the PBC.

¶ 14    In February 2016, the PBC issued public revenue bonds for the purpose of acquiring, constructing, improving, altering, equipping, repairing, maintaining, operating, and securing the Justice Center, including the construction of the Annex.

---

[1] The defendants did not seek approval of the Rock Island City Council (the governing body of the Rock Island County seat) before proceeding with the Annex project.

¶ 15    In July 2017, the Board passed a resolution finding that the courthouse was in a functional state of decrepitude. It also found that the county lacked the funds to rehabilitate the courthouse and that the county had not identified any realistic way to preserve the courthouse. The courthouse is located approximately 40 feet from the Justice Center and Annex. The Board found that demolishing the courthouse was "necessary for the maintenance and security" of the Justice Center and Annex.

¶ 16    On July 17, 2017, the Board and the PBC entered into an intergovernmental agreement that provided that the courthouse's current state of decrepitude and its lack of security posed a risk to the safety and maintenance of the adjacent Justice Center and Annex, as well as to those using it. For that reason, the Board found that the demolition of the courthouse fell within the "[p]roject scope requirements" of the Annex project. The intergovernmental agreement stated that the county shall direct the PBC to demolish the courthouse once all county offices and functions ceased being conducted from the courthouse, "as approved by resolution passed by the *** Board." Demolition was defined to include "the improvement of the site as necessary to protect the new Courthouse." Regarding the county and PBC's obligations under the Commission Act, the intergovernmental agreement found that the area for the PBC's existing work on the Annex would be expanded to cover the location of the courthouse. The PBC would pay for the design of the demolition plan and site improvement, including all costs of construction and demolition, from funds available to it. If the PBC found that it lacked sufficient funds to accomplish this, it had the discretion to notify the county administrator, at which point the intergovernmental agreement would become ineffective.

¶ 17    On November 9, 2017, Chief Judge Braud announced his intention to ask the PBC to demolish the courthouse using excess proceeds from the bonds that had been issued to finance

7

the Annex. The chief judge stated that if the PBC refused to "do what [he thought] need[ed] to be done," he would issue "an administrative order to say, you will tear it down." The chief judge maintained that he could issue such an order based on his authority as chief judge to "manage courthouses," which, he indicated, meant that "he can build them, he can erect them, and he can tear them down."

¶ 18      On November 13, 2017, Chief Judge Braud sent a letter to the Board outlining his proposal and asking the Board to "respond favorably to [his] proposal on or before January 1, 2018." The chief judge indicated that "any delay past January 1 [would have] a cost associated with it, not in your favor," because the chief judge would reallocate the $1.6 million in PBC bond funds he had set aside for the demolition. In his letter, the chief judge reiterated what he had said to the media one week earlier, namely, that he had the authority to administratively order the courthouse razed, but he preferred not to resort to "litigation to force [the Board and PBC] to pay for razing" the courthouse.

¶ 19      On July 17, 2018, the Board approved the demolition of the courthouse and contracted with the PBC to undertake the demolition. The courthouse is adjacent to, but not within, the existing Justice Center and Annex. (As noted above, the courthouse is located approximately 40 feet from the Annex.) The defendants did not seek or obtain approval from the Rock Island City Council or Rock Island voters for a new site before agreeing to undertake the demolition of the courthouse.

¶ 20      On December 7, 2018, the PBC's contractor, Missman Inc., wrote to the IDNR informing the agency that "[t]he [PBC] is now proposing the demolition of the Rock Island County Court House located at 210 15th Street in Rock Island" and is "requesting a determination as to whether the project has satisfied all applicable requirements of Illinois law with respect to

Historic Preservation." On December 11, 2018, the defendants submitted a revised application to the IEPA for a permit to discharge stormwater associated with the demolition site, which the defendants were required to secure before proceeding with the demolition of the courthouse.[2] The IEPA permit application form required the applicant to certify that it had submitted the project proposal to the "Historic Preservation Agency" (which the General Assembly has folded into the IDNR as part of the recent amendments to the Preservation Act) in compliance with Illinois law. The IEPA's website states that no stormwater permits will be effective until a project has received "sign-off" from IDNR that the project complies with historic preservation laws.

¶ 21         On December 11, 2018, the IDNR advised the PBC that the courthouse is a "historic resource" within the meaning of the Preservation Act and that the PBC's proposed demolition would result in an adverse impact on a historical resource and was therefore subject to review under section 4 of the Preservation Act. The IDNR stated that the PBC should participate in the statutorily mandated consultation process between IDNR and IEPA to determine if there was a way to avoid the adverse effect (*i.e.*, the demolition). The IDNR also directed the PBC not to conduct any demolition activities until the process prescribed by the Preservation Act was complete. However, on December 13, 2018, the PBC informed the IDNR that it did not believe that the courthouse was subject to the executive demands of the IDNR and that it planned to proceed with the demolition.

¶ 22         On January 25, 2019, Chief Judge Braud issued an administrative order directing the defendants to demolish the courthouse pursuant to his administrative authority as chief judge. In

---

[2] Under the terms of the IEPA's general stormwater permit, an applicant submits a notice of intent (NOI) to use the permit, and the applicant may proceed to discharge stormwater 30 days after submitting the NOI unless the IEPA informs the applicant otherwise.

his administrative order, Chief Judge Braud made findings of fact and conclusions of law. Specifically, Chief Judge Braud found that, given the close proximity of the courthouse to the Annex, it posed a security risk to judicial personnel and to those visiting the Annex. The chief judge also found that the courthouse's condition of disrepair posed risks to those who would be in the area of the courthouse. The chief judge issued the administrative order without notice, without conducting a hearing, and without affording any party the opportunity to present evidence or legal argument. On February 8, 2019, the plaintiffs filed a petition to intervene in the administrative action and a motion to vacate the court's administrative order. The Rock Island County Circuit Clerk's office refused to accept the plaintiffs' petition to intervene and motion to vacate, stating that there was no pending case in which the plaintiffs could intervene.

¶ 23        On February 6, 2019, the plaintiffs filed their verified complaint in this action seeking a TRO halting the demolition of the courthouse. The complaint alleged that (1) the proposed demolition is subject to the Preservation Act and would violate that Act (count I), (2) the proposed demolition project violates the site approval requirements in the Commission Act (count II) and falls outside the limited purpose of the PBC (count III), and (3) the PBC's plan to use excess bond proceeds from the Annex project to pay for the demolition of the courthouse violates the Commission Act (count IV) and the PBC's covenants with bondholders (counts V through VI), which require the PBC to deposit all excess bond proceeds into a sinking fund dedicated solely to the retirement of the bonds. The defendants filed motions to dismiss the plaintiffs' complaint under section 2-615. The Board also filed a section 2-619 motion to dismiss the complaint for lack of standing.

¶ 24        On March 8, 2019, the circuit court granted the plaintiffs' motion for a TRO and directed the defendants to refrain from demolishing the courthouse until the circuit court addressed the

10

defendants' pending motions to dismiss. The circuit court held that the plaintiffs had demonstrated (1) a "clearly ascertainable right in need of protection," (2) "irreparable harm" in the absence of a TRO, (3) that there was "no adequate remedy at law," and (4) that plaintiffs had demonstrated a "likelihood of success" for purposes of obtaining a TRO.

¶ 25     On March 19, 2019, after hearing arguments from the parties, the circuit court orally granted the defendants' motions to dismiss for failure to state a claim pursuant to section 2-615 of the Code. The trial court dismissed the plaintiffs' claim under the Preservation Act (count I) because it found that the Preservation Act exempted local government agencies and their officers from its requirements and because IEPA's granting a permit for stormwater drainage did not constitute an "undertaking" by a state agency subject to the Preservation Act.

¶ 26     The trial court also dismissed counts II and III of the plaintiffs' complaint, which asserted claims under the Commission Act. In dismissing count II, the court held that the PBC had the authority to demolish the courthouse under section 14(c) of the Commission Act, which authorizes a public building commission to "demolish, repair, alter, or improve any building or buildings within the area" that the commission had previously selected for a building project. In dismissing count III, the trial court found that the demolition of the courthouse would not constitute an unauthorized enlargement of the PBC's purpose, even though the courthouse was not structurally connected to the jail or part of the physical site including the jail and the Annex, because (1) the 2015 Litigation had already determined that the PBC's construction of the Annex (which included a new courthouse) was within the PBC's purpose and authority to build a jail and (2) "common sense tells you if it is the purpose of the commission to building [*sic*] the new courthouse, how is it not the same purpose to tear the old one down?"

11

¶ 27 The trial court also dismissed counts IV through VI of the plaintiffs' complaint (the bond agreement counts). Count IV alleged that the defendants had violated the Commission Act by using excess proceeds from the sale of the Annex bonds to finance the demolition of the courthouse and the construction of a park instead of transferring those monies into the sinking fund after the Annex was constructed and declared ready for occupancy. In count V, the plaintiff bondholders alleged that the PBC had breached the bond agreements by modifying the terms of the bond resolution to allow bond proceeds to be used to finance a demolition project separate and apart from the Annex project set forth the transaction documents. In count VI, the plaintiff bondholders alleged that the PBC had breached the bond agreements and associated transaction documents by misappropriating bond proceeds for a separate project rather than depositing such proceeds in the bond and interest fund.

¶ 28 The court dismissed counts I, II, and III (claims brought under the Preservation Act and the Commission Act) with prejudice and dismissed counts IV through VI (the bond contract counts) without prejudice. Although the court granted the plaintiffs leave to replead the bond contract counts, it barred them from repleading any claims relating to the purpose of the PBC under the Commission Act. The circuit court dissolved the existing TRO because it determined that counts IV through VI, if repleaded, would have an adequate remedy at law.

¶ 29 The plaintiffs orally moved the court to reconsider its order vacating the TRO and asked the court to leave the TRO in place for seven days while the plaintiffs decided whether to take an appeal. The defendants objected. The trial court denied the plaintiffs' motion.

¶ 30 On March 21, 2019, the plaintiffs filed an interlocutory appeal of the circuit court's ruling dissolving the TRO pursuant to Illinois Supreme Court Rule 307(d) (eff. Nov. 1, 2017) (appeal No. 3-19-0146), and an emergency petition to stay the circuit court's March 19, 2019, order in its

entirety pursuant to Illinois Supreme Court Rule 305(d) (eff. July 1, 2017) pending appeal on the merits of the trial court's dismissal of the plaintiffs' complaint. On March 22, 2019, we granted the plaintiffs' emergency petition to stay pending appeal.

¶ 31    That same day, the circuit court entered a final written order memorializing its March 19, 2019, oral ruling. The circuit court's order included a written finding, pursuant to 304(a), that "an appeal may be taken from its final judgment on counts I, II, and III because there is no just reason for delaying an appeal." Later that day, after the circuit court entered its written ruling (including its special finding pursuant to Rule 304(a)), plaintiffs filed their notice of appeal in this case (appeal No. 3-19-0159).

¶ 32    On April 1, 2019, we granted plaintiffs' Rule 307(d) petition and ordered that both the stay we had previously entered and the TRO issued by the circuit court shall remain "in full force and effect" until we have issued a decision in the instant appeal.

¶ 33                                ANALYSIS

¶ 34    The plaintiffs argue that the trial court erred in granting the defendants' motion to dismiss because the defendants' proposed demolition of the courthouse violates both the Preservation Act and the Commission Act. Before reaching the merits of the plaintiffs' statutory claims, we must address two threshold issues raised by the defendants. The defendants contend that our appellate court "may" lack jurisdiction over this interlocutory appeal because the circuit court did not issue its Rule 304(a) finding of immediate appealability until after the plaintiffs filed their initial notice of interlocutory appeal under Rule 307(d). In addition, the defendants maintain that the plaintiffs lacked standing to bring their claims in the circuit court. We address each of these issues in turn.

¶ 35                          1. Appellate Jurisdiction

13

¶ 36        The defendants suggest that our appellate court "may lack jurisdiction" to decide this

appeal under Rule 304 because the plaintiffs did not obtain a Rule 304(a) finding from the trial

court until after they filed their notice of interlocutory appeal under Rule 307(d). The filing of an

interlocutory appeal divests the trial court of jurisdiction to change or modify the interlocutory

order that is on appeal or to make any ruling that would affect the subject matter or substance of

that interlocutory order. *R.W. Dunteman Co. v. C/G Enterprises, Inc.*, 181 Ill. 2d 153, 162

(1998); *Brownlow v. Richards*, 328 Ill. App. 3d 833, 836-37 (2002). The Board argues that the

trial court's addition of Rule 304(a) language to its written judgment order after the plaintiffs

filed their Rule 307(d) notice of interlocutory appeal in this case "substantively altered the nature

of the pending Rule 307 appeal" because it enabled the plaintiffs to obtain the relief from the

appellate court that they had sought in the Rule 307 appeal, *i.e.*, a stay of the trial court's

dismissal order or a TRO preventing the demolition of the courthouse pending the disposition of

an interlocutory appeal under Rule 304(a). The Board argues that the plaintiffs could not have

obtained any such relief from the appellate court at the time they filed the Rule 307 appeal

because they had not yet obtained a Rule 304(a) finding of appealability from the circuit court at

that time. From this premise, the defendants argue that (1) the circuit court "may have lacked

jurisdiction" to enter the Rule 304(a) finding in its March 22, 2019, Order" because the plaintiffs

"may have already divested the Circuit Court of jurisdiction by filing a Rule 307(d) appeal,"

(2) the trial court's written order containing the Rule 304(a) finding is a therefore a nullity, and

(3) this court therefore lacks jurisdiction to decide this appeal pursuant to Rule 304.

¶ 37        We do not find these arguments to be persuasive. Although the filing of a notice of

appeal transfers jurisdiction from the trial court to the appellate court *instanter*, "the trial court

retains jurisdiction on matters collateral or supplemental to the judgment" (*In re N.L.*, 2014 IL

14

App (3d) 140172, ¶ 23), and "orders entered after the filing of the notice of appeal are valid *if the substantive issues on appeal are not altered so as to present a new case to the reviewing court*" (emphasis added) (*R.W. Dunteman Co.*, 181 Ill. 2d at 162; see also *N.L.*, 2014 IL App (3d) 140172, ¶ 23; *In re Estate of Goodlett*, 225 Ill. App. 3d 581, 587 (1992); *Chavin v. General Employment Enterprises, Inc.*, 222 Ill. App. 3d 398, 405 (1991)). Here, the trial court's March 22, 2019, written judgment order did not alter the substance of its March 19, 2019, oral ruling (which was the subject of the plaintiffs' prior Rule 307(d) appeal) in any way. To the contrary, the trial court's written order merely memorialized and confirmed its prior oral rulings. Specifically, the March 22, 2019, written order confirmed the dissolving of the TRO, the dismissal of counts I through III of the plaintiffs' complaint with prejudice, and the dismissal of counts IV through VI of the complaint without prejudice. Contrary to the Board's contention, the trial court's inclusion of Rule 304(a) language in the written judgment order did not substantively alter the nature of the court's prior judgment in any way. It merely rendered the court's preexisting judgment immediately appealable under Rule 304(a). The defendants cite no authorities holding or suggesting that the mere entry of a finding of appealability under Rule 304(a), without more, substantively alters a preexisting interlocutory order that was previously appealed pursuant to a different rule. Nor have we found any such authority.

¶ 38        In sum, the trial court's written order did not alter the substance or subject matter of the pending Rule 307(d) appeal in any way, much less present a "new case" to our appellate court. The trial court's finding of immediate appealability under Rule 304(a) was therefore valid and within the trial court's continuing jurisdiction. Accordingly, we find that we have jurisdiction decide the plaintiffs' appeal under Rule 304.

¶ 39                                    2. Standing

15

¶ 40    The defendant Board further maintains that the plaintiffs "lack standing to challenge whether the *** Board's decision to demolish the [c]ourthouse violates either the *** Preservation Act or the *** [Commission Act]." According to the Board, private organizations like Landmarks Illinois, Rock Island Preservation Society, and Moline Preservation Society do not have a legally cognizable interest in the demolition of the courthouse and therefore lack standing to challenge the demolition. Moreover, the Board argues that the plaintiffs do not have "taxpayer standing" to challenge the Board's decision because none of the plaintiffs is alleged to have paid taxes in Rock Island County.[3]

¶ 41    A party has standing to bring a claim only when that party has a real interest in the outcome of the controversy. *Chicago Teachers Union, Local 1 v. Board of Education of the City of Chicago*, 189 Ill. 2d 200, 206 (2000); see also *Hill v. Butler*, 107 Ill. App. 3d 721, 725 (1982) ("The concept of standing to bring suit requires that parties before the court seeking relief have a sufficiently protectable interest pursuant to statute or common law which is alleged to be injured."). A self-proclaimed concern about a matter of public interest does not grant standing, no matter how sincere. *Landmarks Preservation Council of Illinois v. City of Chicago*, 125 Ill. 2d 164, 175 (1988); *Lombard Historical Comm'n v. Village of Lombard*, 366 Ill. App. 3d 715, 717 (2006). However, members of the public have a protectable interest in ensuring that public

---

[3] On February 22, 2019, the plaintiffs moved to file a proposed verified amended complaint that added Oestreich as a party and identified her as a Rock Island County taxpayer. The defendants argue that Oestreich is not a proper party to this appeal because the trial court never issued an order granting the plaintiffs' motion. However, the trial court's March 15, 2019, order granting the TRO listed Oestreich as a party in the case caption and temporarily enjoined the defendants from carrying out any demolition activities "with regard to the building identified in Plaintiffs' Verified Amended Complaint as the Historic Courthouse." This suggests that the trial court allowed the plaintiffs to file its verified amended complaint adding Oestreich as a party. In any event, the plaintiffs have not argued, either before the trial court or on appeal, that their standing to file the instant lawsuit derives from any plaintiff's status as a Rock Island County taxpayer.

16

officials follow the requirements of public statutes. *Lombard Historical Comm'n*, 366 Ill. App. 3d at 718; *Hill*, 107 Ill. App. 3d at 725.

¶ 42 Lack of standing is an affirmative defense. *Lombard Historical Comm'n*, 366 Ill. App. 3d at 718; *Hill*, 107 Ill. App. 3d at 725; *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 494 (1988). Accordingly, a plaintiff need not allege facts establishing standing; rather, it is the defendant's burden to plead and prove lack of standing. *Chicago Teachers Union, Local 1*, 189 Ill. 2d at 206. Here, the Board challenged the plaintiffs' standing in its motion to dismiss the plaintiffs' complaint under section 2-619 of the Code. The trial court rejected the Board's argument and found that the plaintiffs had standing to bring their claims. In ruling on a section 2-619 motion, a court must accept as true all well-pleaded facts in plaintiff's complaint and all inferences that can reasonably be drawn in plaintiff's favor. *Chicago Teachers Union, Local 1*, 189 Ill. 2d at 206; *Hermitage Corp. v. Contractors Adjustment Co.*, 166 Ill. 2d 72, 85 (1995). The court should grant the motion only if the plaintiff can prove no set of facts that would support a cause of action. *Chicago Teachers Union, Local 1*, 189 Ill. 2d at 206. Our review of a trial court's disposition of a section 2-619 motion is *de novo*. *Id.*; *Carver v. Nall*, 186 Ill. 2d 554, 557 (1999).

¶ 43 We agree with the trial court that the plaintiffs have standing to bring their claims under the Preservation Act and the Commission Act. As an initial matter, members of the public, including private parties, have a protectable interest in ensuring that public officials follow the requirements of public statutes. *Lombard Historical Comm'n*, 366 Ill. App. 3d at 718; *Hill*, 107 Ill. App. 3d at 725. Thus, the private party plaintiffs in this case, including both the individuals and the associations named as plaintiffs, have standing to challenge the Board's demolition of a publicly owned courthouse where such demolition is alleged to violate the requirements of the

17

Preservation Act and the Commission Act. See *Lombard Historical Comm'n*, 366 Ill. App. 3d at 718 (holding that the Lombard Historical Commission, The Friends of the Du Page Theatre, and an individual had standing to challenge the Village of Lombard's (Village) plan to demolish the Du Page Theatre, where the Village owned the theatre and the plaintiffs alleged that the demolition would violate a Village ordinance); [4] *Hill*, 107 Ill. App. 3d at 725 (ruling that, where the object of a *mandamus* action is the enforcement of a public right, a private plaintiff has standing to bring the action due to his "interest[ ] as a citizen in having the laws properly executed" (internal quotation marks omitted)).

¶ 44    Moreover, certain of the plaintiffs have standing for additional reasons. Two of the plaintiffs, Landmarks Illinois and Shaw, are bondholders. Section 16 of the Commission Act provides that bondholders may, "[b]y civil action, sue to enjoin any acts or things which may be unlawful, or in violation of any of the rights of the bondholder" or

> "[b]y mandamus, injunction or other civil action, compel the Commission, and the member or members, officers, agents or employees thereof, to perform each and every term, provision and covenant contained in any resolution, trust agreement or contract with or for the benefit of such bondholder, and to require the carrying out of any or all such covenants and agreements of the Commission and the

---

[4] The Board attempts to distinguish *Lombard Historical Comm'n* on the ground that the plaintiffs in that case were held to have standing as taxpayers of the Village of Lombard, whereas in this case "there is no Plaintiff alleged to be a taxpayer of Rock Island County." However, the court in *Lombard* addressed taxpayer standing as an alternative basis for standing *in addition to* a private party's protectable interest in ensuring that public officials follow the requirements of public statutes. *Id.* at 718. It did not hold that the later interest was dependent on any plaintiff's status as a taxpayer. See also *Hill*, 107 Ill. App. 3d at 725. But even assuming *arguendo* that only taxpayers may assert a protectable interest in ensuring that public officials follow the law, that would not eliminate the plaintiffs' standing in this case. In their verified amended complaint, which the trial court implicitly granted, the plaintiffs added Oestreich as a plaintiff and alleged that she paid taxes to the Village of Rock Island.

18

fulfillment of all duties imposed upon the Commission by this Act." 50 ILCS 20/16 (West 2016).

In this case, plaintiffs Landmarks Illinois and Shaw have alleged that the defendants' planned demolition of the courthouse would violate the terms of their bond agreements with the defendants because the defendants have misappropriated excess bonds from the Annex project to fund the demolition. Thus, plaintiffs Landmarks Illinois and Shaw have alleged that the demolition of the courthouse would cause them to suffer an injury in fact to a legally recognized interest, both under the terms of the bond agreements themselves and under section 16 the Commission Act. As bondholders, Landmarks Illinois and Shaw have standing to file suit to prevent the planned demolition and to compel the defendants to discharge their obligations under the bond agreements and the Commission Act.

¶ 45 In addition, the National Trust for Historic Preservation (National Trust), a congressionally chartered not-for-profit corporation, has standing to challenge the defendants' demolition of the courthouse pursuant to the federal Historic Sites, Buildings, and Antiquities Act (16 U.S.C. § 468 *et seq.* (2012)). In that statute, Congress gave the National Trust broad authority to sue in State courts to prevent the unlawful demolition of buildings it "deems of national historic significance," even buildings that have not been officially designated as national landmarks, and even when the demolition would violate state law, rather than federal law. *Landmarks Preservation Council of Illinois*, 125 Ill. 2d at 176-77. In *Landmarks*, our supreme court found that the National Trust had standing to bring a declaratory judgment action against the City of Chicago (City) and a private owner of a building to challenge the City's rescinding of the building's landmark status. *Id.*

19

¶ 46    The Board argues that *Landmarks* is distinguishable because, in *Landmarks*, the building at issue was at one time included in the National Register of Historic Places, whereas, in this case, there is no allegation in the complaint that the National Trust has deemed the courthouse to be of national historic significance. (The plaintiffs have merely alleged that IDNR has determined that the courthouse is eligible for listing in the National Register.) However, *Landmarks* does not hold or imply that the National Trust has standing to file a lawsuit to prevent the destruction of a historic building only if it has previously listed the building on the National Registry of Historic Places. To the contrary, in *Landmarks*, our supreme court recognized that: (1) Congress "intended the National Trust's functions to be extremely broad"; (2) Congress created the National Trust, in part, "to preserve for public use historic sites, buildings, and objects of national significance for the inspiration and benefit of the people of the Unites States"; and (3) "in order to perform its congressionally mandated functions, the National Trust must be allowed to maintain suits in State courts to prevent unlawful destruction of buildings *it deems* of national historic significance," even if those buildings do not have national landmark status. (Emphasis added and internal quotation marks omitted.) *Id.* at 176-77. By joining the lawsuit at issue in this case, the National Trust has shown that it deems the courthouse to be of historic significance. That is all that is required to confer standing on the National Trust under 16 U.S.C. § 468. *Id.* Such standing includes the right to sue the defendants to halt the proposed demolition of the courthouse and to enforce the requirements of the Preservation Act and the Commission Act.[5]

_____

[5] The plaintiffs further argue that all of the private party plaintiffs have standing to challenge the demolition under the Preservation Act because section 4(c) of the Preservation Act grants "private organizations" the right to participate in the statutorily mandated consultation process in an effort to obviate harm to a historically significant building, and the plaintiffs "have standing to protect that statutory right." In *Landmarks*, our supreme court rejected a similar argument with respect to a municipal ordinance that provided a similar right of participation. See *Landmarks Preservation Council of Illinois*,

3. Plaintiffs' Claim Under the Preservation Act

¶ 48        In count I of their complaint, the plaintiffs' alleged that the demolition of the courthouse

is subject to the Preservation Act and may not proceed until the IDNR and IEPA have completed

the consultation process prescribed by the Preservation Act. The trial court rejected the plaintiffs'

claim and dismissed count I with prejudice pursuant to section 2-615 of the Code. The plaintiffs

contend that this was error and urge us to reverse the trial court's dismissal of their claim under

the Preservation Act.

¶ 49        A motion to dismiss under section 2-615 challenges the legal sufficiency of a complaint

based upon defects that are apparent on the face of the complaint. *Heastie v. Roberts*, 226 Ill. 2d

515, 531 (2007); *Sandholm v. Kuecker*, 2012 IL 111443, ¶ 54. In determining whether a

complaint is legally sufficient, a court must accept as true all well-pleaded facts, draw all

reasonable inferences from the well-pleaded facts in favor of the nonmoving party, and construe

the allegations in the complaint in the light most favorable to the plaintiff. *Heastie*, 226 Ill. 2d at

531; *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 429 (2006); *Board of Directors of*

*Bloomfield Club Recreation Ass'n v. The Hoffman Group, Inc.*, 186 Ill. 2d 419, 424 (1999). The

dispositive question is whether the allegations of the complaint, when considered in a light most

favorable to the plaintiff, are sufficient to state a cause of action upon which relief can be

granted. *Hoffman Group, Inc.*, 186 Ill. 2d at 424. A trial court should not dismiss a claim under

---

125 Ill. 2d at 175 ("we [are not] prepared to recognize as a basis for standing an alleged right to participate in a public hearing for participation's sake, at least where, as here, a municipality has bestowed that alleged procedural right apparently not as a legal entitlement but as a tool to assist the municipality in performing its legislative function"). Because we find that the plaintiffs have standing for other reasons, we need not determine whether the legislature intended the right of participation it granted to private parties under the Preservation Act to be a legal entitlement sufficient to confer standing on such parties.

section 2-615 "unless it is clearly apparent that no set of facts can be proved that would entitle the plaintiff to recovery." *Heastie*, 226 Ill. 2d at 531; *Marshall*, 222 Ill. 2d at 429.

¶ 50    The purpose of the Preservation Act is to provide Illinois state government leadership in preserving, restoring, and maintaining certain historic resources of the State. 20 ILCS 3420/1 (West 2016). Toward that end, the Preservation Act requires state agencies, in consultation with the Director of Natural Resources, to "institute procedures to ensure that State projects consider the preservation and enhancement of both State owned *and non-State-owned* historic resources." (Emphasis added.) *Id.* The Preservation Act defines a "historic resource" as "any property which is either publicly or privately held" and that meets one of four specified criteria, including that the property is eligible for listing in the National Register of Historic Places as determined by the Director of Natural Resources. *Id*. § 3(c).

¶ 51    The Preservation Act's requirements apply to any "undertaking" that will potentially affect the character or use of a historic property. *Id*. §§ 3(f), 4. The Act defines an "undertaking" as "any project, activity or program that can result in changes in the character or use of historic property, if any historic property is located in the area of potential effects," where such project, activity, or program is "under the direct or undirect jurisdiction of a State agency *or licensed or assisted by a State agency*." (Emphasis added.) *Id*. § 3(f). Under the statute, an "undertaking" includes, but it not limited to, actions "(1) directly undertaken by a State agency; (2) supported in whole or in part through State *** funding assistance; or (3) *carried out pursuant to a State* lease, *permit*, license, certificate, approval, or other form of entitlement or permission." (Emphasis added.) *Id.*

¶ 52    The Act imposes various mandatory procedural requirements upon such state agency "undertakings." First, written notice of the project must be given to the Director of Natural

22

Resources either by the state permitting agency or by the recipients of the state agency's funds, permits, or licenses. *Id.* § 4(a); see also 17 Ill. Adm. Code § 4180.200(a) (eff. Jan. 25, 1993). Such written notice must be given to the director before the state agency approves the final design or plan of any undertaking, funds the undertaking, or takes any action of approval or entitlement as to any private undertaking. 20 ILCS 3420/4(a) (West 2016); 17 Adm. Code § 4180.200 (eff. Jan. 25, 1993).

¶ 53       Within 30 days of receiving notice of the proposed undertaking and any documentation that the director deems necessary, the director must review and comment to the state agency on the likelihood that the undertaking will have an "adverse effect" on the historic resource. 20 ILCS 3420/4(b) (West 2016). An "adverse effect" includes the destruction of the historic resource. *Id.* § 3(d)(1). If the director determines that there will be no adverse effect, he must inform the state agency to that effect and the project may proceed. 17 Ill. Adm. Code § 4180.300(b) (eff. Jan. 25, 1993). However, if the director finds that an undertaking will adversely affect a historic resource, the state agency shall consult with the director and shall discuss alternatives to the proposed undertaking that could eliminate, minimize, or mitigate the undertaking's adverse effect. 20 ILCS 3420/4(c) (West 2016); see also 17 Ill. Adm. Code §§ 4180.300(c), 4180.350(a) (eff. Jan. 25, 1993). During the consultation process, the state agency must explore all feasible and prudent plans that eliminate, minimize, or mitigate adverse effects on historic resources. 20 ILCS 3420/4(c) (West 2016); see also 17 Ill. Adm. Code § 4180.350(a) (eff. Jan. 25, 1993). Permittees, representatives of national, state, or local units of government, and other interested parties may participate in the consultation process. 20 ILCS 3420/4(c) (West 2016); 17 Ill. Adm. Code § 4180.350(b) (eff. Jan. 25, 1993). The consultation process may involve on-site inspections and public informational meetings pursuant to IDHR

23

regulations. 20 ILCS 3420/4(c) (West 2016); see also 17 Ill. Adm. Code § 4180.350(b) (eff. Jan. 25, 1993).

¶ 54    If the director and the state agency agree that there is a feasible and prudent alternative that eliminates, minimizes, or mitigates the adverse effect of the undertaking, or if they agree that there is no such alternative, the director must prepare a memorandum of agreement describing the alternatives or stating the finding. 20 ILCS 3420/4(d) (West 2016); see also 17 Ill. Adm. Code § 4180.350(d) (eff. Jan. 25, 1993). The state agency may proceed with the undertaking once the Memorandum has been signed by both the Director and the state agency. 20 ILCS 3420/4(d) (West 2016).

¶ 55    If the director and the state agency fail to agree on the existence of a feasible and prudent alternative that eliminates, minimizes, or mitigates the adverse effect of an undertaking on a historic resource, the state agency must hold a public meeting in the county where the undertaking is proposed within 60 days. 20 ILCS 3420/4(e) (West 2016); see also 17 Ill. Adm. Code §§ 4180.400, 4180.450 (eff. Jan. 25, 1993). If the director and the state agency do not agree on a feasible and prudent alternative within 14 days following conclusion of the public meeting, the proposed undertaking must be submitted to the Historic Preservation Mediation Committee (Committee). 20 ILCS 3420/4(e) (West 2016); see also 17 Ill. Adm. Code § 4180.500(b) (eff. Jan. 25, 1993). Within 30 days after submission of the proposed undertaking to the Committee, the Committee must meet with the director and the state agency to review each alternative and to evaluate whether a feasible and prudent alternative exists. 20 ILCS 3420/4(f) (West 2016); see also 17 Ill. Adm. Code § 4180.500(c) (eff. Jan. 25, 1993). In the event that the director and the state agency continue to disagree, the Committee must provide a statement of findings or comments setting forth an alternative to the proposed undertaking or finding that there is no

24

feasible or prudent alternative. 20 ILCS 3420/4(f) (West 2016). The state agency must consider the written comments of the Committee and must respond in writing before proceeding with the undertaking. *Id.*; see also 17 Ill. Adm. Code § 4180.500(c) (eff. Jan. 25, 1993).

¶ 56    In this case, the plaintiffs have alleged in their complaint that (1) the demolition of the courthouse may not proceed until the PBC has obtained a state agency permit (specifically, a stormwater drainage permit from the IEPA), (2) the courthouse is a "historic resource" because the IDNR has determined that it is eligible for listing in the National Register of Historic Places, and (3) the IDNR has concluded that the proposed demolition threatens the courthouse. These allegations are sufficient to state a claim that the proposed demolition is a state agency "undertaking" subject to the requirements of the Preservation Act. 20 ILCS 3420/3(f) (West 2016) (defining a state agency "[u]ndertaking" as "any project, activity, or program that can result in changes in the character or use of historic property" where such project, activity, or program is "carried out pursuant to a State *** permit *** or other form of entitlement or permission"). Accordingly, the demolition of the courthouse may not proceed until the Preservation Act's procedural requirements, including the Act's mandatory consultation process, have been completed.

¶ 57    The plaintiffs have further alleged that (1) through its contractor, the PBC asked the IDNR to provide a "determination as to whether the [proposed demolition] project has satisfied all applicable requirements of Illinois law with respect to Historic Preservation"; (2) four days later (well within the 30-day time period prescribed by section 4(b) of the Preservation Act), the IDNR advised the PBC that the courthouse is a "historic resource" within the meaning of the Preservation Act, that the PBC's proposed demolition would result in an adverse impact on a historical resource and was therefore subject to review under section 4 of the Preservation Act,

25

and that the PBC should participate in the statutorily mandated consultation process between IDNR and IEPA to determine if there was a way to avoid the adverse impact (*i.e.*, the demolition); (3) The IDNR also directed the PBC not to conduct any demolition activities until the consultation process prescribed by the Preservation Act was complete; and (4) two days later, the PBC informed the IDNR that it did not believe that the courthouse was subject to the executive demands of the IDNR and that it planned to proceed with demolition. These allegations are sufficient to state a claim for a threatened violation of the Preservation Act. Accordingly, the trial court erred in dismissing count I of the plaintiffs' complaint to enjoin the demolition pending the completion of the Preservation Act's mandatory consultation process.

¶ 58 The trial court dismissed the plaintiffs' claim for several reasons, none of which has merit. First, the trial court noted that the Preservation Act expressly exempts "units of local government and their officers" from its definition of "State agency." From this, the trial court concluded that the defendants in this case, both of whom are units of local government, are not required to follow the Preservation Act's requirements. Similarly, the defendants argue that, although section 4 of the Preservation Act imposes consultation obligations upon the IDNR and any state agency that approves or licenses certain "undertakings," it imposes no obligations upon nonstate actors like the defendants. Interested parties other than state agencies *may*, but are *not required* to, take part in the consultation process prescribed by the Preservation Act. 20 ILCS 3420/4(c) (West 2016); 17 Ill. Adm. Code § 4180.350(b) (eff. Jan. 25, 1993). Thus, the defendants contend, the statute creates no private right of action against nonstate actors, and nonstate parties cannot be liable for violations of the Preservation Act and may not be sued under the Preservation Act.

¶ 59     We disagree. While it is true that the Preservation Act exempts "units of local government and their officers" from its definition of "State agency,"[6] that does not mean that units of local government may not participate in "undertakings" that are subject to the Act's requirements. To the contrary, section 3(f) of the Preservation Act unambiguously defines an "undertaking" as "*any* project, activity or program that can result in changes in the character or use of historic property" where such project, activity, or program is "licensed or assisted by a State agency," including actions "carried out pursuant to a State *** *permit* *** or other form of entitlement or permission." (Emphasis added.) 20 ILCS 3420/3(f) (West 2016). "Undertakings" conducted by units of local government like the PBC are not excluded from this definition. To the contrary, the legislature's use of the broadly inclusive phrase "*any* project, activity, or program" plainly evinces its intent to include "undertakings" conducted by units of local government. Where the language of a statute is clear, we may not read into its exceptions, limitations, or conditions that the legislature did not express, and we will give it effect as written. *Harrisonville Telephone Co. v. Illinois Commerce Comm'n*, 212 Ill. 2d 237, 251 (2004); *In re County Treasurer & ex officio County Collector*, 373 Ill. App. 3d 679, 685 (2007). Accordingly, an "undertaking" under the statute (which includes any project requiring a state agency permit that threatens a historic resource) may not commence until the Preservation Act's consultation requirements have been satisfied, regardless of whether it is carried out by the state, by a private party, or, as here, by a unit of local government.

¶ 60     We have reached this conclusion based upon the Preservation Act's plain and unambiguous language. However, we note that we would reach the same conclusion even if we

---

[6] Section 3(b) of the Preservation Act defines "[a]gency" as having "the same meaning as in Section 1-20 of the Illinois Administrative Procedure Act" (20 ILCS 3420/3(b) (West 2016)), which excludes "units of local government and their officers" (5 ILCS 100/1-20 (West 2016)).

27

were to find the Preservation Act to be ambiguous as to this issue. In its amicus brief, the IDNR argues that the defendants' proposed demolition of the courthouse is an "undertaking" under the Preservation Act because it would be carried out pursuant to a state permit (*i.e.*, the IEPA's water discharge permit). The IDNR notes that applying the Preservation Act to all "undertakings" conducted pursuant to State permits, even those conducted by units of local government, is consistent with the IDNR's longstanding practice. Because the IDNR is the state agency charged with administering and enforcing the Preservation Act, its interpretation of an ambiguous provision in the Preservation Act is entitled to substantial weight and deference. *Crittenden v. Cook County Comm'n on Human Rights*, 2013 IL 114876, ¶ 19; *People ex rel. Birkett v. City of Chicago*, 202 Ill. 2d 36, 46 (2002); *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 97-98 (1992). [7] That is so even if the IDNR has articulated its interpretation for the first time in an amicus brief (instead of a formal rulemaking proceeding or agency adjudication), unless there is reason to believe that the interpretation is merely a *post hoc*, self-interested litigation position that does not reflect the agency's considered judgment on the matter or the interpretation conflicts with prior agency decisions or clearly conflicts with the statute at issue. *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142 (2012); see also *Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195 (2011); *Auer v. Robbins*, 519 U.S. 452, 461-62 (1997). None of those circumstances exist here. As the IDNR notes, the interpretation of the Preservation Act advanced in its legal brief is consistent with the IDNR's past practice. The defendants do not deny this. Accordingly, the IDNR's position in this case represent its considered judgment rather than a *post hoc*, self-interested litigation position. Further, as noted above, the IDNR's position is

---

[7] The defendants argue that the plaintiffs forfeited this argument by not raising it before the trial court. However, forfeiture is a limitation on the parties, not on the court, and a reviewing court may ignore forfeiture in order to achieve a just result. *In re Amanda H.*, 2017 IL App (3d) 150164, ¶ 33.

28

consistent with the Act's plain language. Thus, even if there were some ambiguity about the Preservation Act's application to the demolition as issue in this case, which there is not, we would defer to the IDNR's interpretation that the Preservation Act applies.

¶ 61     We also reject the defendants' argument that they may not be enjoined from violating the Preservation Act's requirements. In this case, the IDNR timely advised the PBC that the courthouse is a "historic resource" within the meaning of the Preservation Act and that that the PBC's proposed demolition would result in an adverse impact on a historical resource and was therefore subject to review under section 4 of the Preservation Act. The IDNR also directed the PBC not to conduct any demolition activities until statutorily mandated consultation process between IDNR and IEPA was completed, and it and encouraged the PBC to participate in that consultation process (as contemplated by the Preservation Act). Nevertheless, despite initially notifying the IDNR (through its contractor/agent) of the proposed demolition and seeking the IDNR's input as to the Preservation Act's requirements, the PBC ignored the IDNR's directive and planned to conduct the demolition before the consultation process had been completed, in clear violation of the Preservation Act. Under these circumstances, the plaintiffs properly sued to enjoin the defendants from demolishing a publicly owned historic resource before the statutorily required consultation between IDNR and IEPA had occurred. The issuance of an injunction is proper to prevent public officials, including units of local government and their officers, from taking actions that are outside the scope of their authority or otherwise unlawful. *Village of Westmont v. Lenihan*, 301 Ill. App. 3d 1050, 1060 (1998); see also *Lindsey v. Board of Education of the City of Chicago*, 127 Ill. App. 3d 413, 422 (1984). Here, defendants intend to defy the IDNR's directive that they halt the proposed demolition of the courthouse until the consultation process mandated by the Preservation Act has taken place. The defendant's plan to

29

demolish the building in defiance of the IDNR's directive would circumvent, and therefore thwart, the Preservation Act's mandatory procedural requirements that govern the undertaking at issue in this case. If the demolition planned by the defendants in this case cannot be enjoined until the statute's consultation requirements have been satisfied, then those requirements would be rendered so toothless as to be meaningless.

¶ 62    Moreover, it is significant that the plaintiffs are seeking only injunctive relief, not tort damages. They are merely seeking to enforce their protectable right to ensure that the public entity defendants do not act in a manner that would frustrate the proper operation of the law. Accordingly, the plaintiffs do not need to demonstrate that the Preservation Act creates an implied right of action for damages in order to proceed with their claims for injunctive relief. See generally, *Village of Westmont*, 301 Ill. App. 3d at 1060; *Lindsey*, 127 Ill. App. 3d at 422; *Lombard Historical Comm'n*, 366 Ill. App. 3d at 718; *Hill*, 107 Ill. App. 3d at 725; *Noyola v. Board of Education of the City of Chicago*, 179 Ill. 2d 121 (1997).

¶ 63    The defendants concede that no published Illinois cases address whether nonstate agency defendants may be enjoined from destroying a historic building pending the conclusion of the Preservation Act's mandatory consultation process where, as here, that process is alleged to have been properly instituted by the IDNR. In arguing for that proposition, the defendants rely upon three federal cases applying the National Historical Preservation Act (NHPA) (54 U.S.C. § 306108), which the defendants assert is "analogous" to the Preservation Act. The cases cited by the defendants, all of which were decided by the United States Court of Appeals for the Second Circuit, hold that only federal agencies may be sued for violating the NHPA. See *Preservation Coalition of Erie County v. Federal Transit Adm'n*, 356 F.3d 444, 455 (2d Cir. 2004); *Western Mohegan Tribe & Nation of New York v. New York*, 246 F.3d 230 (2d Cir. 2001);

30

*Vieux Carre Property Owners, Residents & Associates, Inc. v. Brown*, 875 F.2d 453, 457-58 (2d Cir. 1989). However, federal decisions applying the NHPA are split on the question of whether parties other than federal agencies may be enjoined from harming a historic property protected by the NHPA pending the completion of consultation and review procedures mandated by the NHPA. In contrast to the Second Circuit cases cited by the defendants, the United States Court of Appeals for the Third Circuit affirmed a federal district court order enjoining a unit of local government from destroying a building under circumstances similar to those presented here. *Morris County Trust for Historic Preservation v. Pierce*, 714 F.2d 271 (3d Cir. 1983) (affirming district court's order permanently enjoining the demolition of a protected building by the Town of Dover Redevelopment Authority, which owned the building, until such time as the federal Department of Housing and Urban Development conducted a historical and cultural resource review of the building pursuant to NHPA); see also *D.C. Federation of Civic Ass'ns v. Adams*, 571 F.2d 1310 (4th Cir. 1978) (stating that the court would be willing to enjoin nonagency actions if it were not ruling that the agency had in fact complied with the NHPA).

¶ 64 The trial court dismissed the plaintiffs' complaint for an additional reason. Specifically, the trial court held that the proposed demolition in this case does not constitute an "undertaking" under the Preservation Act because the IEPA would merely be approving "how they decide to run the water when [the courthouse] is ultimately taken down" and would not be approving the demolition itself. That was error. As noted above, the Preservation Act plainly defines an "[u]ndertaking" to include "*any* project, activity or program that can result in changes in the character or use of historic property" where such project, activity, or program is "licensed or assisted by a State agency," including actions "carried out pursuant to a State *** permit *** or other form of entitlement or permission." (Emphasis added.) 20 ILCS 3420/3(f) (West 2016).

31

The Preservation Act does not require that the permit *authorize the ultimate proposed undertaking* (such as the actual demolition of the building in this case). Rather, the Preservation Act's provisions are triggered whenever an "undertaking" is "carried out pursuant to a State *** permit." *Id.* Here, the demolition project will be "carried out pursuant to" the IEPA's storm water drainage permit because the defendants must obtain that permit in order to complete the demolition project. The Preservation Act therefore applies. The trial court's conclusion that the Preservation Act applies only if the *entire proposed project* is subject to state agency approval represents an unduly narrow construction that contradicts the Preservation Act's plain terms and would frustrate the Preservation Act's expressed purposes.

¶ 65        Echoing the trial court's reasoning, the defendants argue that (1) section 4(a) of the Preservation Act provides, in relevant part, that prior to the approval of the "final design or plan" of any undertaking by a state agency, "written notice of the project shall be given to the [IDNR] Director by the State agency or by the recipients of its *** permits or licenses" and (2) here, the IEPA is not affirmatively "approving" anything, much less the "final design and plan" of the demolition or the demolition site plan. The defendants maintain that, because of the unique nature of the IEPA permitting process, the IEPA does not need to affirmatively give permission for the PBC to use the water permit; rather, the PBC files a NOI to use the IEPA's general stormwater drainage permit, and unless the IEPA informs the PBC within 30 days that it may not use the permit (which was not alleged to have happened in this case), the PBC may use the permit and proceed with demolition without any "sign off" from the IEPA. Moreover, the defendants argue that, because the PBC's use of the water permit would not occur until *after* the demolition, the IEPA's permitting authority in this case could have no effect on the actual

32

demolition. Thus, according to the defendants, the Preservation Act's consulting requirements were not triggered by the IEPA's permitting process in this case.

¶ 66    We do not find these arguments to be persuasive. As noted above, by its plain terms, the Preservation Act applies to any project that threatens a historic resource where the project is "carried out pursuant to" a state permit. In their complaint, the plaintiffs alleged that proposed demolition at issue here must be carried out pursuant to a state permit because the demolition necessitates "a permit from the *** IEPA *** to discharge storm water associated with the construction site." The plaintiffs attached to their complaint the IEPA's permit form, which contains a section for the applicant to certify that the project has been submitted to the "Historic Preservation Agency." The plaintiffs also provided URL of the "Construction Permit Requirements" listed on the IEPA's website that state that IEPA permit applicants are not authorized to proceed as if they have a permit until "the project has received sign-off from IDNR and IHPA that the project complies with *** historic preservation laws." See NPDES Permit for Construction Activities, Ill. Envtl. Prot. Agency, https://www2.illinois.gov/epa/topics/forms/ water-permits/storm-water/Pages/construction.aspx (last visited July 9, 2020) [https://perma.cc/6R6S-443T] (stating that, unless the permit applicant receives a notice of incompleteness letter from the IEPA, the permit applicant receives coverage under the stormwater general NPDES permit automatically, and operators are authorized to discharge stormwater from construction sites under the terms and conditions of the permit 30 days after the date the NOI is received by the Agency, "*provided the project has received sign-off from IDNR and IHPA that the project complies with endangered species and historic preservation laws* and the appropriate application fee has been received by the Agency"). Accordingly, the plaintiffs have sufficiently alleged that the IEPA's permitting process triggers the application of the

33

Preservation Act to the demolition at issue in this case. The defendants' argument that the defendants may use the IEPA permit and proceed with the demolition without receiving any affirmative "approval" from the IEPA, IDNR, or other state agency is belied by the documents that the plaintiffs submitted with their complaint. Moreover, the fact that the IEPA's permission is presumed upon the filing of a NOI by the permit applicant unless the IEPA says otherwise (or unless the applicant fails to obtain the IDNR's authorization pursuant to the Preservation Act) does not change the fact that IEPA permission is required for the "undertaking" at issue. At most, the arguments raised by the defendants present an issue of fact that may not be appropriately resolved on a motion to dismiss.

¶ 67        As an additional reason for its dismissal, the trial court suggested that the plaintiffs' interpretation of Preservation Act was so broad that it would "overtake the statute" and lead to absurd results. The court noted that, if it were to find that merely applying for the type of permit issued by the IEPA would trigger the Preservation Act, than the Preservation Act would apply to "[e]very individual who had to get a permit to remove their shed from their back yard or get a permit to take something down that happened to be in the way" and "whenever the County was building a road and *** had to get a particular permit for something that occurred afterwards." These concerns are grossly exaggerated, however, because the Preservation Act would apply in such cases only if the project at issue both threatens a historic resource and requires a permit from a state agency to proceed. Obviously, removing a shed from one's backyard is unlikely to do either of these things, and the vast majority of permits relating to road construction will not involve threats to historic resources. Thus, we find the trial court's concerns to be unfounded.

¶ 68        The defendants further argue that using the Preservation Act to "override" Chief Judge Braud's administrative order directing the defendants to demolish the courthouse would infringe

34

upon the chief judge's constitutional authority and violate the separation of powers. The Illinois Constitution provides the chief judge with "general administrative authority over his court," including "the authority to provide *** for appropriate times and places of holding court." Ill. Const. 1970, art. VI, § 7(c). The defendants argue that this includes the authority to demolish the adjacent dilapidated and vacant courthouse, if, as both the chief judge and the Board found, such demolition is necessary to ensure that the new judicial facilities in the Annex are safe and suitable to carry out the courts' judicial functions. According to the defendants, if the IDNR (an agency of the executive branch) were able to contravene these decisions by Chief Judge Braud and the Board, it would infringe the powers of both the judicial and legislative branches, thereby offending separation of powers principles.

¶ 69     The Illinois Constitution provides that no branch of government shall exercise powers properly belonging to another. Ill. Const. 1970, art. II, § 1. In addition, separation of powers principles mandate that "[a] statute cannot conflict with court rules or unduly infringe upon inherent judicial powers." *Morawicz v. Hynes*, 401 Ill. App. 3d 142, 150 (2010); see also *People v. Bainter*, 126 Ill. 2d 292, 302-03 (1989). Moreover, there is "no basis to doubt the inherent power of the courts to protect themselves and require production of the facilities, personnel and resources reasonably necessary to enable them to perform their judicial functions with efficiency, independence and dignity." (Internal quotation marks omitted.) *Knuepfer v. Fawell*, 96 Ill. 2d 284, 292 (1983). However, because "the public interest requires that the three branches in our system of government work cooperatively and in harmony," these inherent powers of the judiciary must be exercised "sparingly" and only in "exigent circumstances," particularly when the exercise of judicial power would intrude on the prerogatives of the executive or legislative branches of government. *Id.*

35

¶ 70 Chief Judge Braud's administrative order cannot prevent the application of the Preservation Act's requirements to the proposed demolition of the courthouse in this case. As an initial matter, contrary to the defendants' assertion, the IDNR's initiation of the consultation process required by the Preservation Act and its directive to the defendants' to halt the demolition pending the completion of that process was not an attempt to "override" the chief judge's order. The chief judge's order was not issued until *after* the IDNR directed the defendants to stop the demolition. Thus, if anything, the chief judge's order was an attempt to override the actions the IDNR took pursuant to the Preservation Act.

¶ 71 Moreover, it is unlikely that a chief judge's constitutional authority to determine the "appropriate times and places to hold court" includes the authority to demolish a publicly owned building where court is not held. Nor does a court's authority to "protect [itself]" and to "require *production* of the facilities, personnel and resources reasonably necessary to enable [it] to perform [its] judicial functions with efficiency, independence and dignity" include the power to order a nonjudicial branch of government to *destroy* a historical resource that is not owned or used by the judiciary, and to declare the demolition immune from the Preservation Act or from other applicable laws on the basis of separation of powers. Such an overly expansive construction of judicial powers would infringe upon the rightful authority of the legislative and executive branches.

¶ 72 But even assuming *arguendo* that Chief Judge Braud would have had the inherent authority under certain circumstances to order the demolition of a historically significant former courthouse to promote the safety of the Annex, the manner in which he exercised his purported authority in this case was unlawful. Chief Judge Braud's administrative order was procedurally deficient. "[I]t is essential that any such administrative orders be entered only after a hearing of

36

which adequate notice is given and at which all interested parties are afforded an opportunity to present their views." *Id.* at 294-95. That did not occur here. Chief Judge Braud issued his administrative order requiring the demolition of the courthouse in this case without conducting a hearing, without allowing plaintiffs or other interested parties to intervene or to challenge the administrative order in any way, and without even considering courthouse's historic status or the application of the Preservation Act. Accordingly, the chief judge's administrative order was improperly issued.

¶ 73        Because the inherent powers of the judiciary must be exercised "sparingly" and only in "exigent circumstances," particularly when the exercise of judicial power would intrude on the prerogatives of the executive or legislative branches of government, the most prudent course of action would have been for the chief judge to have refrained from issuing an administrative order to demolish the courthouse until the relatively brief consultation process mandated by the Preservation Act had run its course. In any event, the chief judge was required to hold a proper hearing on the matter before ordering the demolition. Because the chief judge failed to do so in this case, we need not defer to his demolition order. Under the circumstances presented here, halting the demolition pending the completion of the consultation process prescribed by the Preservation Act would not violate the separation of powers or be otherwise improper.

¶ 74        Accordingly, we reverse the trial court's dismissal of the plaintiffs' claim under the Preservation Act, and we remand for further proceedings on that claim. Pursuant to our authority under Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994), we direct the trial court on remand to reinstate and extend the TRO until the consultation process required by the Preservation Act has been completed.

¶ 75                          4. The Plaintiffs' Commission Act Claims

37

¶ 76      The plaintiffs also allege that the defendants' plans to demolish the courthouse would violate the Commission Act in two respects. In count II of their complaint, the plaintiffs allege that the defendants have resolved to demolish the courthouse without satisfying the Commission Act's requirements for the approval of a new "site" (*i.e.*, without obtaining approval of the demolition either by three-fourths of the Rock Island City Council or by a majority of voters in a referendum, as required by section 14(a)(1) of the Commission Act (50 ILCS 14(a)(1) (West 2016)). In count III of their complaint, the plaintiffs allege that the demolition of the courthouse would constitute an illegal and unwarranted expansion of the Commission Act's purpose to "provide a good and sufficient jail." The trial court dismissed both counts pursuant to section 2-615 for failure to state a claim. We will address each claim in turn.

¶ 77      A. Whether the Proposed Demolition Comports With the Commission Act's Site
Approval Requirements

¶ 78      The Commission Act grants a public building commission the power "[t]o select, locate, and designate *** one or more areas *** as the site or sites to be acquired for the erection, alteration or improvement of a building or buildings, public improvement or other facilities." 50 ILCS 20/14(a) (West 2016). Where the original resolution for the creation of the public commission has been adopted by the governing body of the county, as here, "the site or sites selected *** are subject to approval by a majority of the members of the governing body of the county and to approval by 3/4 of the members of the governing body of the county seat." *Id*. § 14(a)(2).

¶ 79      "[I]f such site or sites so selected *** are not approved by 3/4 of the members of the governing body of the county seat the Commission may by resolution request that the approval of the site or sites so selected *** be submitted to a referendum at the next general election in

38

accordance with the general election law." *Id.* If a majority of the electors voting on the proposition vote in favor of the proposition, the site or sites so selected shall be approved. *Id.* The Commission Act further provides that, "[e]xcept where approval of the site or sites has been obtained by referendum, *the area or areas may be enlarged by the Board of Commissioners, from time to time, as the need therefor arises*." (Emphasis added.) *Id.*

¶ 80    The Commission Act also gives a public building commission the power "[t]o demolish, repair, alter or improve any building or buildings within the area or areas" and to "maintain and operate" any new buildings it constructs with the area or areas so as to effectuate the purposes of the Commission Act. *Id.* § 14(c).

¶ 81    Applying these statutory provisions, the plaintiffs argue that the defendants may not demolish the courthouse without first obtaining approval of a new "site" in the manner prescribed by section 14(a)(1) of the Commission Act. Specifically, the plaintiffs maintain that the demolition must be approved by the Board and by either a majority of voters in a referendum or three-fourths of the members of the governing body of the county seat, *i.e.*, the Rock Island City Council (Council). Neither the voters nor the Council have approved the proposed demolition in this case. Accordingly, the plaintiffs argue that they are entitled to an injunction barring the demolition pursuant to the Commission Act.

¶ 82    The trial court rejected the plaintiffs' argument and dismissed count II of their complaint with prejudice under the Commission Act because it found that section 14(c) of the Commission Act authorized the PBC to "demolish *** any building or buildings" within the "area" of a previously approved site without having to seek and obtain approval for a new "site" pursuant to section 14(a) of the Commission Act.

39

¶ 83 We agree. Although the Commission Act requires a PBC to obtain approval for a new "site or sites to be acquired for the erection, alteration, or improvement of a building or buildings, public improvement or other facilities," the Commission Act clearly indicates that, once a project "site" has been selected, acquired, and properly approved under section 14(a), the project "area" "may be enlarged *** as the need arises" *unilaterally by the Board*, without the need for the Board to seek prior approval of such enlargement from the Council, the public, or any other entity, unless the initial approval of the site was obtained by referendum. *Id.* § 14(a)(2). The plaintiffs have not alleged that the initial approval of the project site for the provision of a new jail was obtained by referendum. Nor have they alleged that the Annex Project was approved by referendum. To the contrary, they concede that it was not.[8] Accordingly, even assuming that the initial project "area" for work on the jail and Annex needed to be "enlarged" in order to cover the adjacent courthouse, the Board was clearly authorized to make such an enlargement pursuant to the Commission Act. *Id.* § 14(a)(2). And, once the Board enlarges the work area, the Commission Act expressly authorizes it to "demolish" any building in the enlarged area. *Id.* § 14(c). Thus, the trial court properly dismissed count II of the plaintiffs' complaint because the demolition proposed in this case would not violate the Commission Act.

_____

[8] The plaintiffs argue that the defendants were "statutorily required to" (but did not) seek approval for the Annex project through a referendum because they failed to obtain approval for that project from a supermajority of the Council, as required by section 14(a)(2) of the Commission Act. The plaintiffs maintain that, "[b]y claiming authority to enlarge an area that needed to be approved through a referendum—but was not—the *** PBC attempts to bootstrap one statutory violation to permit another." This argument presumes that the Annex project required prior approval of a new "site" under the Commission Act. That presumption seems dubious because it is undisputed that the Annex building is contiguous with the jail. In any event, the plaintiffs did not allege facts in their complaint supporting their legal conclusion that Council or voter approval of a new site was required before the PBC was authorized to enlarge the initial project area to include the building of the Annex. The plaintiffs point to the PBC's June 17, 2015 resolution approving the "site" to be acquired, altered, and improved by the PBC for the Annex project. Contrary to the plaintiffs' argument, however, this does not constitute an admission by the PBC that the Annex project "site" required prior approval of the Council or the public. To the contrary, the fact that the PBC approved the new area for the Annex project unilaterally on June 17, 2015, without seeking such approval suggests that the PBC believed otherwise.

40

¶ 84    The plaintiffs argue that, because the Commission Act uses the terms "site" and "area" interchangeably throughout section 14 (and because the terms are not defined in the Commission Act), the legislature must have intended the two terms to mean the same thing. From this, the plaintiffs' reason that the Board may not begin working in a new "area" without obtaining prior approval for a new "site" in the manner prescribed by section 14(a). This argument proves too much. If "site" and "area" mean the same thing, then section 14(a) must be read as authorizing the Board to enlarge a previously approved "site" unilaterally without getting further approval from the Council or from voters. Otherwise, on plaintiffs' reading, the provision in section 14(a)(2) authorizing the Board to enlarge an "area" unilaterally as the need arises would have no application and would effectively be read out of the statute. If the Board could enlarge the site/area only by satisfying section 14(a)'s new site approval requirements, then section 14(a)(2)'s provision allowing the Board to "enlarge" the site/area would be rendered superfluous at best and meaningless at worst. We will not interpret the Commission Act in this manner. See *Sylvester v. Industrial Comm'n*, 197 Ill. 2d 225, 232 (2001) (ruling that a reviewing court must read a statute as a whole and "construe the statute so that each word, clause, and sentence, if possible, is given a reasonable meaning and not rendered superfluous [citation], avoiding an interpretation which would render any portion of the statute meaningless or void"); see also *Board of Education of Gardner-South Wilmington High School District 73 v. Village of Gardner*, 2014 IL App (3d) 130364, ¶ 16. Accordingly, even assuming a*rguendo* that the courthouse (which is located only 40 feet from the Annex) is not within the site/area of either the jail or the

41

Annex, the Board had the authority to enlarge the preexisting site/area to encompass the courthouse.[9]

¶ 85                     B. Whether the Demolition of the Courthouse Is Within the PBC's Existing
Purpose

¶ 86        The PBC was established by the Board on October 1, 1981, for the "sole purpose *** of exercising the powers and authority of [the Commission Act] to provide a good and sufficient jail for the use of Rock Island County." In count III of their complaint, the plaintiffs allege that the PBC's proposed demolition of the courthouse is outside of this express and limited purpose. The Commission Act provides that a public building commission's purpose may by expanded only after such expansion has been approved by voters.

> "The purpose of a public building commission created by the county board of any county may not be expanded until the question of expanding the purpose of the public building commission has been submitted to the electors of the county at a regular election and approved by a majority of the electors voting on the question." 50 ILCS 20/4a (West 2016)

In this case, the voters were never asked to decide whether the Commission Act's existing purpose of providing a good and sufficient jail should be expanded to include demolishing the historic courthouse. Thus, the plaintiffs argue, the proposed demolition would be an improper expansion of the PBC's purpose in violation the Commission Act.

---

[9] Because we find that the Board had the authority to enlarge the preexisting site/area under section 14(a)(2) without obtaining prior approval of the Council or the public, we do not need to address the defendants' alternative argument that the Board did not need to obtain the Council's prior approval because the project at issue was intended for use by the County.

¶ 87 The trial court rejected the plaintiffs' argument and dismissed count III of the plaintiffs' complaint under section 2-615 for failure to state a claim. The trial court concluded that "[t]his issue was already decided" in the 2015 Litigation "when it was determined that the [A]nnex was under the umbrella of the PBC's purpose" because "[c]ommon sense tells you if it is the purpose of the commission to build[ ] the new courthouse, how is it not the same purpose to tear the old one down?" The court further reasoned that "[t]o determine otherwise *** would require counties to create multiple commission boards," one "to erect every building they wanted to" and "a subsequent board to tear down the building that it replaced." The court ruled that "[c]ertainly that's not what the legislature had in mind."

¶ 88 Given the circuit court of Henry County's ruling in the 2015 Litigation, we have no choice but to affirm the trial court's dismissal of count III in this case. The *quo warranto* judgment does not have *res judicata* or collateral estoppel effect in this case as to the question whether the demolition of the courthouse is within the PBC's purpose because the issue of demolishing the courthouse was not decided and was not and could not have been raised in the *quo warranto* litigation).[10] Nevertheless, the *quo warranto* judgment does preclude the plaintiffs from arguing that the *building of the Annex* was outside of the PBC's existing purpose to build a good and sufficient jail for the county of Rock Island. See *In re Petition to Create Emmett-*

---

[10] Under the doctrine of *res judicata*, "a final judgment rendered by a court of competent jurisdiction on the merits is conclusive as to the rights of the parties and their privies, and, as to them, constitutes an absolute bar to a subsequent action involving the same claim, demand, or cause of action." *J & R. Carrozza Plumbing Co. v. Industrial Comm'n*, 307 Ill. App. 3d 220, 223 (1999). To establish *res judicata*, a party must show, *inter alia*, that the former adjudication involved the same cause of action and same subject matter of the later case. *Id.*; see also *River Park, Inc. v. City of Highland Park*, 295 Ill. App 3d 90 (1998); *Hannigan v. Hoffmeister*, 240 Ill. App. 3d 1065, 1075-76 (1992). Collateral estoppel precludes the relitigation of a factual or legal issue decided in a prior adjudication only if, *inter alia*, (1) the issue decided in the prior adjudication is identical to the issue in the current action, (2) the issue was "necessarily determined" in the prior adjudication, and (3) the party had a full and fair opportunity to contest the issue in the prior adjudication. *City of Chicago v. Illinois Workers' Compensation Comm'n*, 2014 IL App (1st) 121507WC, ¶ 51.

43

*Chalmers Fire Protection District*, 58 Ill. App. 3d 897, 904 (1978) (judgment in a *quo warranto* proceeding that a fire protection district was legally created was *res judicata* and therefore barred petitioners in a subsequent lawsuit from challenging the legality of the district's existence, even though those petitioners were not parties in the prior *quo warranto* action); see also *People ex rel. Lewis v. Whittaker*, 254 Ill. 537, 541-42 (1912). Because the *quo warranto* judgment was not appealed, it may not be challenged here.

¶ 89        In its July 17, 2018, "Resolution of Authority to Enter Into An Intergovernmental Agreement" with the PBC to demolish the courthouse, the Board made legislative findings that (1) "the *** courthouse is currently in a state of functional decrepitude with insufficient County funds to rehabilitate it," (2) "to date[,] no realistic solution for the preservation of the courthouse has been identified," and (3) "the future demolition of the *** courthouse is necessary for the maintenance and security of the Justice Center and the Justice Center Annex project." "[L]egislative fact finding authority is broad and should be accorded great deference by the judiciary." (Internal quotation marks omitted.) *Empress Casino Joliet Corp. v. Giannoulias*, 231 Ill. 2d 62, 75 (2008). Courts are not empowered to adjudicate the accuracy of legislative findings, and the legislature is not required to convince a reviewing court of the correctness of its judgment. *Id.* Courts grant the same level of deference to legislative fact findings done by municipalities in municipal ordinances. *Independent Voters of Illinois Independent Precinct Organization v. Ahmad¸* 2014 IL App (1st) 123629, ¶¶ 38, 41. Further, "the county board is itself the judge of the necessity of building" and maintaining a county courthouse. *County of Coles v. Goehring*, 209 Ill. 142, 166 (1904) (deference to a county board's decision). Because the *quo warranto* proceeding determined that the building of the Annex was within the PBC's purpose of building a good and sufficient jail, the Board's legislative finding that the demolition of the

44

"decrepit[ ] courthouse is necessary for the maintenance and security of the Justice Center Annex project" (a finding that is entitled to deference) establishes that the demolition of the courthouse is within the PBC's existing purpose.

¶ 90    We consider the Henry County circuit court's *quo warranto* judgment to be indefensible, and if that judgment had been appealed, we would have reversed it. As a matter of simple logic, we find it difficult to understand how the purpose of building a *jail* includes the purpose of building a *courthouse* (which is what the Annex essentially is). Moreover, the circuit court of Henry County expressly found that the building of the Annex "enhanced" the PBC's existing purpose of building a jail. By definition, that means that the building of the Annex *was not already included* in the PBC's existing purpose. See Merriam-Webster Online Dictionary, www.merriam-webster.com/dictionary/enhance (last visited July 10, 2020) [https://perma.cc/EX6Q-X5AX] (defining "enhance" as "heighten, increase"). We find the circuit court's expansion of the PBC's purpose to include the building of a new courthouse particularly inappropriate here because (1) the Board had already acknowledged that the PBC lacked the authority to build a new courthouse under its initial purpose of providing a good and sufficient jail for Rock Island County and (2) the Board therefore put the matter to the voters via referendum (in order to follow the requirements of the Commission Act) and the voters *overwhelmingly rejected* the proposal to expand the PBC's purpose to build a courthouse. However, because the *quo warranto* judgment was never appealed, and because of the Board's subsequent legislative findings, we are constrained to affirm the dismissal of count III. *Emmett-Chalmers Fire Protection District*, 58 Ill. App. 3d at 904; *People ex rel. Lewis*, 254 Ill. at 541-42.

¶ 91 In addition, we note that the Board also made a legislative finding that the demolition of the courthouse was necessary for the maintenance and security of the "*Justice Center*" itself, which includes the jail building and some courthouses and other judicial facilities inside that building. Maintaining the jail building and keeping it safe and secure would fall within the PBC's initial purpose of providing a good and sufficient jail, even without the highly questionable 2015 *quo warranto* judgment. Moreover, maintaining and securing the Justice Center (which was built to effectuate the purposes of the Commission Act), as well as demolishing other buildings within the expanded "area" of the Justice Center, falls within the PBC's statutory authority under the Commission Act. 50 ILCS 20/14(c) (West 2016). Accordingly, under the circumstances presented in this case, the plaintiffs can prove no set of facts that would entitle them to relief on count III of their complaint. Dismissal of that count was therefore proper.

¶ 92                                CONCLUSION

¶ 93 For the reasons set forth above, we affirm the judgment of the circuit court of Rock Island County dismissing the plaintiffs' claims under the Commission Act (counts II and III). We reverse the trial court's dismissal of the plaintiffs' claim under the Preservation Act (count I) and remand for further proceedings on that claim. We direct the trial court on remand to enter a TRO barring the demolition of the courthouse until the consultation process required by the Preservation Act has been completed.

¶ 94 Affirmed in part and reversed in part; cause remanded.